

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISON

El PASO APARTMENT ASSOCIATION,       §
et. al,                              §
                                     §          CAUSE No.
    Plaintiffs,                §
                                     §          EP-08-CA-145-DB
v.                                   §
                                     §
CITY OF EL PASO, et al.,             §
                                     §
    Defendants.                §

## DEFENDANTS' RESPONSE TO PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION

**TO THE HONORABLE JUDGE OF THE COURT:**

DEFENDANTS the City of El Paso, Texas ("City"), the El Paso Water Utility – Public

Service Board ("EPWU"), and Edmund G. Archuleta, in his official capacity as President

and CEO of EPWU )("Archuleta"), all collectively "Defendants," file this Response to

the Application for Preliminary Injunction[1] of the El Paso Apartment Association

("EPAA"), et al. (all collectively "Plaintiffs"), and say as follows:

### I. INTRODUCTION

    Plaintiffs challenge an aspect of the new El Paso Drainage Utility's storm water

drainage rate tariff.  They challenge both the classification of apartment complexes as

"commercial" ratepayers, and the manner of determining the rates applied to apartment

complexes.  Plaintiffs argue, in essence, that apartment complexes are wrongly classified

as commercial ratepayers because they have tenants, just as members of the "residential"

ratepayer class do; and that the inclusion of certain impervious cover in determining the

---

[1] "Plaintiffs' Application for Temporary Restraining Order and for Preliminary Injunction."  The Court previously denied the Application for Temporary Restraining Order.

rates paid by apartment complexes but not in the determination of residential rates is discriminatory, both on Equal Protection grounds and as a violation of the Fair Housing Act, 42 U.S.C. §§ 3601 et seq.  They also attach a supplemental state law claim, asserting that the storm water drainage fee violates the Texas Constitution as being an "occupation tax" rather than a utility fee, because it  "does not reflect the City's actual cost to provide the service for which the fee is being charged."   Plaintiffs' Original Complaint ("Complaint") ¶ 39.  Plaintiffs have asked for injunctive relief in the form of a temporary restraining order ("TRO"), which this Court denied; and a preliminary injunction. Plaintiffs' Application for Temporary Restraining Order and for Preliminary Injunction ("Application") ¶¶ 12, 39.  The preliminary injunction should also be denied.

**The Fair Housing Act claim**

Plaintiffs assert that the storm water drainage fee violates the federal Fair Housing Act, 42, U.S.C. §§ 3601, et. seq., because the storm water drainage fees imposed on apartment complexes, which are classified as "commercial" ratepayers, are higher than those imposed on "residential" ratepayer classes, and thus have a disparate (and discriminatory) impact on protected minority groups, which are alleged to constitute a disproportionately large proportion of apartment dwellers.  Complaint ¶17, Application ¶¶ 18, 19.  Specifically, Plaintiffs challenge the classification of apartment complexes as commercial ratepayers.  Complaint ¶¶ 18, 20, 31.  Plaintiffs also urge that the basis for the commercial rates imposed on apartment complexes – the total impervious cover of the subject lot, including paved parking lots, internal drives and walkways, *see* Complaint ¶16, Application ¶7 – is discriminatory as compared to the basis for residential rate because the basis for residential rates excludes driveways.  Application ¶¶ 8, 9.

**The Equal Protection claim**

Plaintiffs urge that there is no basis for distinguishing them, as property owners, from residential ratepayers, that is "rationally related to any legitimate public purpose." Complaint ¶ 53. Plaintiffs challenge the classification distinction itself. Complaint ¶¶ 51, 53, 54; Application ¶¶ 30-33. Plaintiffs appear also to challenge the distinction in the determination of commercial rates and residential rates, again because the former are based on measuring total impervious cover while the latter are alleged not to include impervious cover from residential driveways. Complaint ¶51; Application ¶30.

**The state law claim**

Finally, Plaintiffs assert a state law claim based on supplemental jurisdiction under 28 U.S.C. section 1367. They assert that the storm water drainage fee is, under Texas, law, not a legal fee at all, but an "occupation tax," which is in excess of the lawful limits applicable to such taxes, *see* Complaint ¶¶ 21-22, 33-36; Application ¶¶ 21-24; and which was not properly enacted as such a tax by following the procedures required under state law. Complaint ¶¶ 37-38; Application ¶26.

## II. LEGAL STANDARD FOR PRELIMINARY INJUNCTION

Plaintiffs must satisfy a four-element test to warrant the granting of a preliminary injunction: They must establish (1) likelihood of success on the merits; (2) irreparable harm if the relief is not granted; (3) that the threatened injury if the relief is not granted outweighs the threatened harm to defendant if the relief is granted; and (4) that granting the injunction will not disserve the pubic interest. *Mississippi Power & Light Co. v. United Gas Pipeline Co.*, 760 F.2d 618, 621 (5th Cir. 1985); *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567 (5ht Cir. 1974).

Plaintiffs assert that no showing of irreparable harm is required when suit is brought "under a statute expressly permitting injunctive relief."   Application ¶35. Plaintiffs rely on *EEOC v. Comsair, Inc.*, 821 F.2d 1085, 1090-91 (5th Cir. 1987) and *Murry v. American Standard, Inc.*, 488 F.2d 529, 531 (5th Cir., 1973), for this proposition.  Application ¶21.  However, these were Title VII claims, not Fair Housing Act (Title VIII) claims.  Moreover, the Supreme Court has rejected this logic.  In *Amoco Production Co. v. Village of Gambrel, Alaska*, 480 U.S. 531, 107 S.Ct. 1396 (1987), the Court said

> the fundamental principle [is] that an injunction is an equitable remedy that does not issue as of course. ... [T]he bases for injunctive relief are irreparable injury and inadequacy of legal remedies. . . . Of course, Congress may intervene and guide or control the exercise of the courts' discretion, but we do not lightly assume that Congress has intended to depart from established principles. . . . "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."

480 U.S. at 542, 107 S.Ct. at 1402 (citations omitted); *see also Black Fire Fighters Ass'n of Dallas v. City of Dallas*, 905 F.3d 63, 66-67 (5th Cir. 1990) (Jones, J. concurring) ("our circuit's unique rule allowing a presumption of irreparable injury *in certain Title VII cases* cannot stand in light of *Amoco Production Co. v. Village of Gambrell* ....") (emphasis added).  The Fair Housing Act does not require the granting of injunctive relief, but merely authorizes it, according to the court's discretion:

> In a civil action under subsection (a) of this section, if the court finds that a discriminatory housing practice *has occurred* or is about *to occur*, the court . . . *may* grant as relief, *as the court deems appropriate*, any permanent or temporary injunction, temporary restraining order, or other order . . .

42 U.S.C. § 3613(c)(1) (emphasis added).[2]    No presumption of irreparable harm is imposed "in so many words, or by a necessary and inescapable inference."  To the contrary, the statutory language is expressly permissive (the court "may" grant injunctive relief") and discretionary (relief "as the court deems appropriate").  *Cf. Dews v. Town of Sunnyvale*, 109 F.Supp. 526, 573 (N.D. Tx. 2000) (application of "traditional principles of equity" in Fair Housing Act case).

Moreover, the statute imposes a condition precedent:  that a violation "has occurred" or is about "to occur" – not merely that there has been a finding of likelihood of success on the merits, but that there has been a finding of an actual violation, or that an actual violation actually is about to occur.  That is not the situation here.  This Court has already denied the Plaintiffs' request for a TRO, holding that Plaintiffs had "not established their burden of proving immediate and irreparable harm."

### III.  APPLICATION OF STANDARDS TO PLAINTIFFS' CLAMS

**A.    Irreparable Harm**

This Court was correct on this issue in the TRO ruling.  Plaintiffs have not carried their burden to prove irreparable harm, and cannot.  Nothing has changed since then.

First, the only actual complaint alleged is that damages, if any, will be money damages, which, if a storm water drainage fee rate were found to be illegal, could be refunded to any affected ratepayers.  There is no proof or even any allegation that the effect of impermissible disparate impact of the storm water drainage fee, if any, would result in any non-monetary damages, such as actual eviction of any minority apartment dweller or the denial of housing to any would-be minority apartment dweller.

---

[2]  This language is different than the language concerning injunctive relief under Title VII.  *See* 42 U.S.C. §2000e-5(g).

Second, EPWU is not going to cut any resident's water off for failure to pay a challenged fee. *See* Application ¶38. Plaintiffs had that express assurance – in writing – from EPWU, well before filing suit. *See* **Exhibit A**. . Mr. Edmund Archuleta, President and CEO of EPWU, will be present to testify to that effect at the preliminary injunction hearing.

As discussed above, Plaintiffs are not entitled to a presumption of harm. They have not, and cannot, prove irreparable harm, as to any of their claims. Their request for preliminary injunctive relief should be denied on this basis alone.

**B.      Likelihood of Success on the Merits**

Plaintiffs have not pleaded, and cannot offer facts, sufficient to show a likelihood of success on the merits as to any of their three claims. The Equal Protection and Fair Housing Act claims both fail per se when the basis for the rate structure is explained; traditional and usual ratemaking principles were used, and provide the rational basis that defeats these claims. Adherence to those traditional ratemaking standards also defeats the state law ("occupational tax") claim, because the rates were established based on the actual costs of providing the services in question, contrary to the contrary allegation underlying Plaintiff's claim.

      **1.      The Equal Protection Claim**

Plaintiff's Equal Protection claim that they are not treated as residential ratepayers fails because there is a rational basis for their classification as commercial ratepayers.

            **a.      Rational basis standard**

The rational basis test applies to Plaintiffs' Equal Protection claim. Apartment owners are not a protected (suspect) class. Under this test, there need be only a rational,

non-arbitrary basis for the classification.

> Under rational-basis review, where a group possesses "distinguishing characteristics relevant to interests the State has the authority to implement," a State's decision to act on the basis of those differences does not give rise to a constitutional violation. [There must be only] a rational relationship between the disparity of treatment and some legitimate government purpose. . . . Moreover, the State need not articulate its reasoning at the moment a particular decision is made.   Rather, the burden is upon the challenging party to negative "any conceivable state of facts that could provide a rational basis for the classification."

*Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 366-67, 121 S.Ct. 955, 963-64 (2001) (citations omitted).   This is a heavy burden.   Plaintiffs' conclusory allegations that there is no rational basis for their classification to be different from residential ratepayers is wholly insufficient to "negative any conceivable state of facts that could provide a rational basis for the classification."   It is not enough to show merely that the rates to which they are subject are different than residential rates.

Plaintiffs' assertion that there is no rational basis for the classification of apartment complexes as commercial enterprises is without merit on its face.   They clearly are commercial, for-profit businesses.   Moreover, a characteristic of apartment complexes as compared to single-family, detached houses, or even duplexes or triplexes (included in the residential classification), is the typically larger – often substantially larger – size of the tracts involved, the typically larger footprints of impermeable cover involved, and the relatively larger proportion of impervious cover on such tracts.   These traits alone – shared by other commercial tracts – support the classification of apartment complexes as commercial ratepayers.   Moreover, Plaintiffs are already classified as commercial accounts by the water and wastewater billing system that is used to implement the stormwater fees.

Plaintiffs may not assert the Equal Protection claims of their tenants. *See, e.g., Moose Lodge No. 197 v. Irvis*, 407 U.S. 163, 166, 92 S.Ct. 1965, 1968 (1972) (a plaintiff "has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others.") . Their pleadings are somewhat a muddle in this respect. *See, e.g.,* Application ¶30 ("distinction between owners and residents of apartment complexes, and owners and residents of single-family residences ...."). Plaintiffs' Equal Protection claim can concern only the effects of any disparity in rates *on them* and may not piggy-back on any alleged disparate treatment of their tenants.[3]  Whether or not there may be a disparate effect on their tenants is irrelevant to the Plaintiffs claim.

### b.    Ratemaking principles

Traditional ratemaking principles include the following elements, among others, to which Defendants' rate expert will testify at the preliminary injunction hearing:

1.    The revenue requirement is first determined.  This is based on determinations of, among other things, required operating and maintenance costs and expenses, administrative expenses, debt service, operating reserves and need for capital improvement funds.

2    Rate design.  The ratepayer classes and subclasses are defined, and the assignment of relative financial responsibility to each class and subclass is made. This rate design is not arbitrary but is based on a determination of the relative cost of service to the specific rate class or subclass.

3.    Rates are then developed for the classes and subclasses, divided proportionally among the members of each class and then subclass based on the revenue requirement.  The established rates are not discriminatory, except to the extent that differences in the cost of providing service justify such discrimination.

---

[3]   Adverse, disparate treatment, moreover, is alone insufficient to establish an Equal Protection violation, even in racial discrimination cases, where strict scrutiny applies. *See, e.g., Garrett,* 531 U.S. at 372-73, 121 S.Ct. at 967.  Violations of the Fourteenth Amendment require a showing of intent to discriminate, either direct or as a necessary inference. *Id. See also Metro. Housing Devel Auth. v. Village of Arlington Hts,* 558 F.2d 1283, 1287 (7th Cir. 1977).  Here, the storm water drainage fee rate structure is racially neutral on its face and does not support any allegation of intentional racial discrimination.  Nor have Plaintiffs made any such allegation, in any event.

Thus, the rates assigned are intended to be proportional to the cost of providing the service in question, and ultimately to recover the revenue requirement.

These are, necessarily, not all precisely measured quantities. Collection of fees is necessarily prospective, so there cannot be absolute certainty at the time rates are adopted that the values chosen will in fact result in the recovery of precisely the target revenue requirement: The actual costs and expenses experienced could be more or less than estimated, the number of ratepayers (in each class or subclass) could be different than that estimated, or could change over time; and the data in hand at the time the rates are determined could be incomplete or inaccurate.

### c.   Ratemaking principles applied

In this instance, the fees for storm water drainage service are measured substantially in terms of the amount of impervious cover on a ratepayer's property. The rate design therefore was relatively simple. Two main rate classes were denominated – commercial and residential. As noted, there is a rational basis for this distinction. Within the residential class, three subclasses were defined, each for a different range of residential impervious cover. There could have been more (or fewer) residential subclasses, and the divisions between the classes could have been differently formulated, but EPWU determined that three size classes reflected a reasonable differentiation of the amounts of impervious cover within the range found among residential class members. Under this classification scheme, residential ratepayers on lots with less than 1200 square feet of impervious cover pay somewhat less than residential ratepayers with impervious cover in the range 1201-3000 square feet,[4] who pay less than ratepayers with more than

---

[4]   This is analogous to a "lifeline" rate for low- and fixed-income ratepayers.

3000 square feet. This "rate band" approach was chosen in substantial part for ease of administration and in part because data establishing the exact amount of impervious cover on each individual residential lot was not available. The Central Appraisal District had data about the footprints of residential houses, garages, decks and patios,[5] but not other possibly impervious cover, such as residential driveways. It would have been impractical to have determined precise values and impervious character for driveways lot-by-lot for each of the approximately 140,000 residential lots in El Paso. EPWU used the data available from the appraisal district. This was a rational choice.[6]

There was no need to differentiate between the members of the commercial class in the same way, however, because the amount of impervious cover on each commercial lot was instead to be determined by actual measurement (*e.g.*, on the basis of appraisal district records, aerial photographs, GIS data, on-site measurement, or other data specific to each individual lot). There are far fewer commercial lots in El Paso than residential lots – only approximately 11,500 [7] – still lots of lots, but not nearly so intractable a number as for residential lots. When determining the measure of impervious cover on commercial lots, it was possible to be relatively accurate,[8] and to include driveways and parking lots as well as the footprints of the buildings themselves.[9] The drainage fee

---

[5] The CAD has data on decks and patios only if the owner obtained a permit for the improvement.

[6] It was also expressly authorized by the applicable state statute. *See* Tex. Loc. Gov't Code §402.047(b).

[7] This was the number used at the time the drainage rates initially were promulgated. The current estimated number is higher.

[8] There is an administrative appeals process, where owners who believe the value determined for their lot is inaccurate may seek to correct the errors.

[9] Plaintiffs appear to urge that they should not be charged for impervious cover related to their apartment complexes' parking lots, or interior drives and walkways. Defendants note that residential garages ARE included in the estimate for rate assignments to the residential subclasses.

assessed for a commercial ratepayer is the subject commercial lot's total impervious cover measured in "equivalent residential units" ("ERU") of impervious cover, multiplied by the applicable per-ERU commercial rate.[10]  This was a rational choice.

The revenue requirement was an estimated quantity based on reasonable projections of financial needs.  EPWU constructed a detailed multi-year budget including estimated (a) costs of operation and maintenance of existing storm water utility infrastructure; (b) additional O&M costs for newly-acquired infrastructure based on an estimated schedule of acquisition; (c) costs of administration; (d) costs of estimated capital improvements based on an estimated schedule of acquisition; (e) financing costs (debt service) for capital improvements, based on estimated costs of financing, itself based on the estimated schedule of acquisition; (f) requirements for capital improvements and operating reserve funds, and so on.  These were reasonable estimates, calculated in the customary way based on specific proposed planning for operations and capital improvements acquisition over the budget period.  From these financial data estimates, EPWU estimated the revenue required for each year of the budget period.  This was a rational choice.

### d.  Rates were rationally-based

The rates assigned to each ratepayer class and subclass were based on these estimated revenue requirements, in a way intended to both impose a charge directly related to the amount of impervious cover of the rate payer and recover those revenues each year.  The rates assigned to the individual ratepayer classes and subclasses were rationally-based on their face – and were derived from reasonable estimates of the actual

---

[10]  An ERU is defined to be 2000 square feet.  The commercial per-ERU rate is determined by dividing the revenue requirement attributable to the commercial class by the total number of ERUs in that class.

costs anticipated to be incurred to provide the utility services at issue and the impervious cover of the rate payer.

Traditional ratemaking principles do not require perfection. The EPWU storm water drainage fee rate scheme is based on estimated costs, and rates are allocated to ratepayers on the basis of relative amounts of impervious cover on their lots. It is not exact, but it bears a reasonable approximation to the "actual" on-the-ground situation.

The rates assigned have a per se rational basis. There was no intent to discriminate; indeed, the purpose of the ratemaking was to equitably distribute the burden. Plaintiffs' claim fails on its face; they cannot establish a likelihood of success for their Equal Protection claim.

### 2.    The state law claim

Plaintiffs' state law claim is that the storm water drainage fee is really an "occupation tax" under Texas law, because it is not cost-based, *see* Complaint ¶¶ 35-36; Application ¶¶ 21-22; because it is intended merely to raise an arbitrarily-determined amount of general revenue, *see* Complaint ¶45; Application ¶23; and because, as a tax rather than a lawful fee for storm water drainage services, its enactment did not comply with Texas law. Complaint ¶¶ 37-38; Application ¶¶ 25-26.

All of these allegations fail if the storm water drainage fees are in fact based on cost of service and a demonstrable revenue requirement, and where the revenues are dedicated to the provision of drainage services, as these are, as required by statute. *See* Tex. Loc. Gov't Code § 402.049.

As described in detail above, the rate design was based on traditional ratemaking principles, so the resulting rates are based on the costs anticipated to provide the services

at issue and are allocated among the customer classes on the basis of cost of service, itself based on the relative amounts of impervious cover on individual lots.  The structure and cost recovery is not guaranteed to be perfect, but it is not required to be.  The revenue requirement was reasonably determined, and the rate allocation was rationally based.  There is nothing arbitrary about any part of the rate scheme.

The case relied on by Plaintiffs, *Lowenberg v. City of Dallas*, 51 Tex. Sup. Ct. J. 639, 2008 WL 821040 (Tex., March 28, 2008), concerned a challenge to a city ordinance requiring building registration and imposed a "fire registration fee."  The Court described the distinction before it this way:

> It is sometimes difficult to determine whether a given statue should be classed as a regulatory measure or as a tax measure.  The principle of distinction generally recognized is that when, from a consideration of the statute as a whole, the primary purpose of the fees . . . is the raising of revenue, then such fees are in fact occupation taxes . . . On the other hand, if the primary purpose appears to be that of regulation, then the fees levied are license fees and not taxes.

2008 WL 821040 at *3.  Neither of these two classifications fit the issue raised here; which is to say, where, as here, the storm water drainage fees are service-cost-based, and are not merely a general revenue raising device that would shift the burden of certain costs of generalized city services away from taxpayers,[11] the *Lowenberg* analysis does not apply.  Even if it did, it would not permit the conclusion that the drainage fee is a tax.

The fee was, instead, lawfully enacted by EPWU under Texas Local Government Code chapter 402, subchapter C, concerning municipal drainage utilities, which provides that drainage utility fees may be charged to

---

[11]   *Cf.* 2008 WL 821040 at *3 (city admitted fees were not only to offset any administrative costs of the regulatory program but also to raise enough revenue to cover all costs of fire prevention in commercial buildings, "shifting that burden off the taxpayers.").

a lot or tract of benefited property for drainage service on any basis other than the value of the property, but the basis must be directly related to drainage and the terms of the levy, an any classification of the benefited properties in the municipality must be nondiscriminatory, equitable, and reasonable.

Tex. Loc. Gov't Code § 402.047(a).  The rates set by EPWU comply with the statute.[12]

Plaintiffs' claim that the fee was unlawfully enacted is in effect a challenge to the state

constitutionality of the statute.   Plaintiffs' "occupation tax" claim fails on its face; there

can be no likelihood of success on the merits as to this claim.

### 3.   Fair Housing Act Claim

Plaintiffs' Fair Housing Act claim is, in essence, that the application of the storm

water drainage fee will have a disparate impact on residents of apartment complexes, who

are disproportionately members of protected minority groups.  Complaint ¶¶ 17, 19, 27;

Application ¶¶ 18, 19.

It is Plaintiffs' burden to establish a violation, *i.e.*, that the challenged action was

unreasonable. *E.g.*, *Elderhaven, Inc. v. City of Lubbock*, 98 F.3d 175, 178 (5th Cir. 1996).

They may begin to do so by showing disparate impact of a state action on a protected

minority group.  But that is not conclusive.  The defendant may then offer proof that the

challenged action has a legitimate state purpose and that the action furthers that purpose.

*E.g.*, *Betsey v. Turtle Creek Associates*, 736 F.2d 983, 988 (4th Cir. 1984).

There can be no doubt that the efficient and safe handling of storm water runoff,

which obviously concerns the public safety and welfare, is a legitimate and even

compelling public purpose.  Plaintiffs do not assert otherwise.  It follows that paying for

---

[12]   The utility "must base the schedule of charges for drainage service . . . on an inventory of the lots and tracts within the service area," but it is expressly authorized to "use approved tax plats and assessment rolls for that purpose." *Id.* § 402.047(b).  The land use made of the benefited property may be considered; as may the size, in area, the number of water meters, and topography of the tract. *Id.*

the costs of such a program is a legitimate action.  It remains only to show that imposing and collecting the storm water drainage fees imposed here further that legitimate purpose, and are established reasonably.

> **a.    Have Plaintiffs actually stated a disparate impact claim?**

Nothing in Plaintiff's pleadings or exhibits documents the existence of protected class members or a disparate impact on it.  The allegations are conclusory.  The Census data proffered is statewide data, and does not establish any measures specific to the City of El Paso – the jurisdiction affected by the storm water drainage fees – on which the court might determine the existence or degree of any disparate impact.

Plaintiffs' pleadings, moreover, suggest that a determination of disparate impact depends only on the disparate effects, if any, on apartment residents.  But El Paso is a "majority minority" jurisdiction; that is, a numerical majority of the residents belong to protected minority groups.  Indeed, El Paso has a predominantly minority population: Only approximately 14.6% of the population is Anglo, and approximately 81% is Hispanic.. *See* **Exhibit B**.

More telling, a substantial majority of Hispanic households in El Paso live in owned, not rented, residences.  *See* **Exhibit C**.  The vast majority of homeowners in El Paso are Hispanic, not Anglo.  *See* **Exhibit C**.  Defendants believe that Plaintiffs have improperly limited the impacted minority group analysis to minority apartment dwellers. All minority residents, whether homeowners or renters, are affected by the stormwater fee.  Therefore the analysis of disparate impact must also include the other members of the protected minority groups in El Paso who are subject to the drainage fee – that is, *all* minority group members in El Paso. *See, e.g., Betsey,* 736 F.2d at 987 ("The correct

inquiry is whether the policy . . . had a disproportionate effect on the minorities in the total group to which the policy was applied."); *Coalition of Bedford-Stuyvesant Block Ass'n v. Cuomo*, 651 F.Supp. 1202, 1209 (E.D.N.Y. 1987) ("universe or pertinent area must be the City as a whole, which is the extent of the City's jurisdiction" and effects of challenged practice).

Even if there is a legally actionable disparate impact on apartment residents, as Plaintiffs allege – which Defendants deny – the corrective measures sought by Plaintiffs will mean shifting additional fee burdens to the residential class, which is itself predominantly Hispanic.

There is no hint of discriminatory intent in the promulgation of the storm water drainage fee rates. And it is questionable whether there is any disparate impact on protected minority groups if the correct universe of minority population is considered: not just the apartment resident population, but the majority of the population of El Paso – predominantly minority group members – who constitute the residential ratepayer class.

### b.   Actionable disparate impact has not been shown

The underlying issue here boils down to Plaintiffs' complaint that apartment complexes are being charged for the impervious cover on their lots represented by their parking lots, interior drives and roadways and interior walkways, whereas the residential class is not being explicitly charged for its impervious driveways. (Garages are included in the appraisal district data.) Plaintiffs make two central arguments: First, they urge that their properties actually are residential rather than commercial, and have been irrationally misclassified by Defendants. They base this argument entirely on the superficial logic that their buildings have tenants, too, notwithstanding the character of their business.

Second, they urge that impervious cover results in the same amount of storm water runoff per square foot. On this basis, they allege they and their tenants are being discriminatorily treated because apartment complexes' parking lots, interior drives and walkways are included in the calculation of impervious cover on their lots, which determines their drainage fees, whereas the residential classes do not pay for their "parking lot equivalents" since residential driveways are not expressly included.

These arguments have some superficial appeal. But examination of the actual rate design shows they fail to establish that the basis for their ratepayer classification or for the manner of determining their impervious cover subject to the fee is irrational. It is not a perfect system, but it is not required to be; it is, however, a rational system.[13]

### i.      Apartments are commercial

The residential-commercial class distinction is made on the basis of existing water utility accounts, a reasonable basis. The apartment owners all have commercial water utility accounts. If individual apartment units are individually metered by the water utility, each renter is charged directly a per-apartment fee comparable to the residential fee for a comparably-sized residence. Apartments that do not have individual water meters are billed to the single commercial meter serving the facility. Plaintiffs could install water meters for each individual apartment unit if they wished, and shift that portion of the fees to the apartment dwellers. Moreover, the apartments are part of an undeniably for-profit business. None of the Plaintiffs urges that they operate on a cost-recovery-only basis.

---

[13] Note that some courts have recognized that, where the Fair Housing Act defendant is a governmental body "acting within the ambit of legitimately derived authority, we will less readily find that its action violates the Fair Housing Act." *Village of Arlington Hts*, 558 F.2d at 1293 (7th Cir. 1977); *citing Joseph Skillken & Co. v. City of Toledo*, 528 F.2d 867, 876-77 (6th Cir. 1975), *vacated and remanded*, 429 U.S. 1068, 97 S.Ct. 800 (1977).

ii.     "Parking lot equivalents"

Residential accounts are billed the storm water drainage fee based on Central Appraisal District ("CAD") data.  There are three residential subclasses, each of which encompasses a fairly wide range of lot sizes.  Residential ratepayers are placed into one of the three subclasses based on the CAD data of the residential footprint, including the house, garage and any decks or patios.  The CAD data fixes the impervious cover of the lot, which determines the rate subclass.  The CAD data does not include data indicating the area of the driveway.[14]  It would be hugely expensive and impractical to go out and measure the driveways in each of the approximately 140,000 non-apartment residences of El Paso.  It was not an unreasonable decision to forgo that exercise, and to rely on the CAD data even if incomplete.  Moreover, considering the wide range of sizes included in each of the three residential subclasses, addition of a driveway's worth of impervious cover would not that often change the subclass in which a particular residence was placed.

But on the basis that there is not perfect accountability for driveways among the residential ratepayers, Plaintiffs ask that all of their parking lots, interior drives and walkways be excluded from the fee.

c.     **Plaintiffs fail on both aspects of their claim**

To prevail on a Fair Housing Act claim, Plaintiffs must prevail on both aspects of it:  (a) that they are residential, and (b) that charging them for their parking lots, drives and walkways is impermissibly discriminatory.  This they cannot do.  Defendants used a reasonable basis to make the residential-commercial class distinction.  The apartments are

---

[14]  Not all driveways are impervious in any event.

a for-profit business, after all; and Defendants utilized the existing water utility classifications. Defendants used a reasonable basis to determine classification of the residential subclasses, even though the CAD data lacked details about residential driveways. Neither of these decisions was irrational or unreasonable.

**d.   Plaintiffs cannot establish likelihood of success on the merits**

Plaintiffs cannot show that the treatment of the residential driveways is equivalent to the total exclusion of all apartment complex parking lots, drives and interior walkways. They do not have the missing data on the residential driveways, either. It would not be enough for them to urge an approximation for accounting for those driveways; that is in effect what they complain that Defendants should not have done. Moreover, such an approximation would be difficult: Not all residences have drives; not all driveways are impervious cover. There is no evidence that there is anything like a standard-sized residential driveway. Garages are already included in the residential rates, as the CAD has that data, so the analogy urged by Plaintiffs as to their parking lots is not apt, and there is no data to suggest what correlation, if any, there actually may be.

Considering Plaintiffs' problems of proof on this issue merely reinforces the necessary conclusion that Defendants' treatment of the issue was not only rational but reasonable. In short, Plaintiffs cannot demonstrate a likelihood of success on the merits for their Fair Housing Act claim, either.

**C.   Public Interest and Balancing of Harms**

Plaintiffs cannot prevail on either of these factors. It cannot be denied that there is a legitimate and strong interest in improving the City's storm water drainage facilities; the storms of August 2006 were an all-too-vivid demonstration that the City was not

19

prepared for such an event. That event was the genesis for the creation of the drainage utility whose goal it is to repair and maintain the existing system of storm water management infrastructure, to modernize it and to add new facilities as quickly as circumstances and funding permit.

No one denies the need for this storm water management program. It is also true that, being an expensive undertaking, no matter what funding mechanism is established, not everyone will be satisfied with it.

Apartments, as large commercial ratepayers, constitute a significant source of needed revenue for the storm water management program. As businesses that tend to have a significant amount of impervious cover, they are also significant contributors to the runoff problem whose solution and management is so vital. Enjoining collection of all storm water drainage fees from these ratepayers would significantly and adversely affect the ability of the drainage utility to successfully implement this fledgling storm water management program. The public interest clearly favors denial of injunctive relief.

This suit is more about the fees due from the apartment owners than it is about the possible adverse impact of the fee structure on minority residents of Plaintiffs' apartments. Denying Plaintiffs' requested injunctive relief, on the other hand, will do no more than cause them money damages, if indeed they should ultimately establish the rates are illegal. Any improperly collected fees can be refunded.

The public interest consideration favors denial of the preliminary injunction, as does the balancing of harms factor.

### IV.  CONCLUSION

Plaintiffs cannot establish likelihood of success on the merits as to any of their three claims.  The Equal Protection claim fails because the rate structure of the storm water drainage fees is based on traditional ratemaking principles, and is rationally-based.  The rational basis test applies because the plaintiff apartment owners are not themselves members of a protected class; and they cannot assert the claims of their minority tenants.  The state law claim, that the fee is really an occupation tax, fails because the fee is designed according to traditional ratemaking principles to recover the costs applicable to providing the storm water drainage service, and not to collect additional general revenues.  The Fair Housing Act claim fails on several grounds:  Plaintiffs cannot establish even a prima facie case of disparate and discriminatory impact; and even could they, the imposition of a cost-based fee for the storm water drainage and management service at issue, with a rationally-based rate structure, clearly serves a compelling state interest.

There is no irreparable harm to Plaintiffs or to their tenants.  Plaintiffs are not entitled to a presumption of irreparable harm. No one is going to have their water service terminated for failure to pay disputed stormwater fees.   Any harm is merely money damages, which can be remedied by refunds if the fees were improperly collected.

The public interest clearly is in having the fledgling storm water management program continue and be successful.  Enjoining collection of fees from Plaintiffs, whose properties are a significant source of required revenues for the program, would seriously compromise the ability of the drainage utility to carry out the needed program.

More harm to Defendants and the public would result from granting the requested injunction – creating a potentially serious funding shortfall for the storm water management program – than would result to Plaintiffs if the injunction is denied: They will suffer only money damages, which a refund of would cure.

The preliminary injunction should be denied.

More harm to Defendants and the public would result from granting the requested injunction – creating a potentially serious funding shortfall for the storm water management program – than would result to Plaintiffs if the injunction is denied: They will suffer only money damages, which a refund of would cure.

The preliminary injunction should be denied.

Respectfully submitted,

Douglas G. Caroom
State Bar No. 03832700

Sydney W. Falk, Jr.
State Bar No. 06795400

Bickerstaff Heath Delgado Acosta LLP
816 Congress Ave., Suite 1700
Austin, Texas 78701
Tel: (512) 472-8021
Fax: (512) 320-5638

Alejandro (Alex) Acosta, Jr.
State Bar No. 00835600
Bickerstaff Heath Delgado Acosta LLP
1112 Montana Avenue
El Paso, Texas 79902
Tel: (915) 533-1810
Fax: (915) 533-1841

Robert D. Andron
State Bar No. 01254600
El Paso Water Utilities - Public Service Board
1154 Hawkins Boulevard
El Paso, Texas  79925
Tel: (915) 594-5607
Fax: (915) 594-5699

By:   _____
        Sydney W. Falk, Jr.

Attorneys for Defendants
City of El Paso, et al.

## CERTIFICATE OF SERVICE

I hereby certify, by my signature below, that on May 9, 2008, I electronically filed the foregoing Defendants' Response to Plaintiffs' Application for Preliminary Injunction with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

James A. Martinez
James A. Martinez, P.L.L.C.
501 N. Kansas, Suite 201
El Paso, Texas 79901
915/543-9718 (fax)

John P. Mobbs
4157 Rio Bravo
El Paso, Texas 79902
915/532-8373 (fax)

Sydney W. Falk, Jr.

1

## Nancy E. Gutierrez

**From:** Nick J. Costanzo
**Sent:** Wednesday, May 07, 2008 2:47 PM
**To:** Nancy E. Gutierrez
**Subject:** FW: stormwater issues

Here is the email you requested. Nick

**From:** Nick J. Costanzo
**Sent:** Friday, April 25, 2008 10:22 AM
**To:** 'Bbowling4@aol.com'
**Cc:** Ed Archuleta; Marcela Navarrete; Luis A. Barajas; Alicia Guerra; Paula Apodaca; John E. Balliew; Giardina, Rick; 'Bricmont, Angela'
**Subject:** stormwater issues

Bob thank you and Dimitrius for meeting with us yesterday to better understand the Apartment Assoc.'s issues and appeals. As you know we are taking input from all our customers and meeting with customers individually to understand their issues regarding the storm water utility and billing issues. We have been reporting and summarizing issues raised by our customers to the PSB. We will report to the PSB the Apartment Assoc.'s specific concerns. Staff will be making recommendations to the PSB to address these concerns and alleviate the impact of the storm water bills. We believe the PSB will take action on these items very shortly.

We encourage all our customers to pay their bills. If there is any retroactive adjustment on individual bills, the adjustment will be credited to your account. However, during the appeal process, if you chose not to pay your stormwater portion of your bill, we will not disconnect the water service.

I will notify you and the Apartment Assoc. immediately upon PSB action. In the meantime, let me know if you need anything else.

Thank you, Nick

**From:** Bbowling4@aol.com [mailto:Bbowling4@aol.com]
**Sent:** Friday, April 25, 2008 8:32 AM
**To:** Nick J. Costanzo
**Subject:** (no subject)

Nick,

Just following up from yesterday, were you going to be able to send me something in writing today?  Thanks.

R. L. "Bobby" Bowling IV
President
Tropicana Building Corporation
4655 Cohen
El Paso, TX 79924
(915) 821-3550

1



EXHIBIT
A

Need a new ride? Check out the largest site for U.S. used car listings at <u>AOL Autos</u>.

THE STATE OF TEXAS      §
COUNTY OF EL PASO       §


The undersigned hereby certifies that the attached document is a true and accurate copy of the original document created or kept in the usual course of business by El Paso Water Utilities which original is on file at the Utility's principal business office at 1154 Hawkins Blvd., El Paso, Texas.

EXECUTED this ___4th___ day of ___May___, 2008.

Nicholas Costanzo
Vice-President, Strategic, Financial &
Management Services

**U.S. Census Bureau**
American FactFinder

| Main | Search | Feedback | FAQs | Glossary | Site Map | Help |

Data Set: 2006 American Community Survey
Survey: 2006 American Community Survey

Result contains 1 row.

NOTE. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.

| | Universe: TOTAL POPULATION: Total | | Universe: TOTAL POPULATION: Hispanic or Latino | | Universe: TOTAL POPULATION: Not Hispanic or Latino | | Universe: TOTAL POPULATION: Not Hispanic or Latino; White alone | | Universe: TOTAL POPULATION: Not Hispanic or Latino; Black or African American alone | | Universe: TOTAL POPULATION: Not Hispanic or Latino; Ame Alaska i | | Univer POPULATIO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | B03002_1_EST | B03002_1_MOE | B03002_12_EST | B03002_12_MOE | B03002_2_EST | B03002_2_MOE | B03002_3_EST | B03002_3_MOE | B03002_4_EST | B03002_4_MOE | B03002_5_ES |
| El Paso city, Texas | 596,189 | +/-8,236 | 482,727 | +/-8,035 | 113,462 | +/-2,738 | 87,274 | +/-2,518 | 14,283 | +/-1,428 | 1,41 |

1. An "*" entry in the margin of error column indicates that too few sample observations were available to compute a standard error and thus the margin of error. A statistical test is not appropriate.

2. An "**" entry in the margin of error column indicates that no sample observations were available to compute a standard error and thus the margin of error. A statistical test is not appropriate.

3. An '-' entry in the estimate column indicates that no sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest interval or upper interval of an open-ended distribution.

4. An '-' following a median estimate means the median falls in the lowest interval of an open-ended distribution.

5. An '+' following a median estimate means the median falls in the upper interval of an open-ended distribution.

6. An '***' entry in the margin of error column indicates that the median falls in the lowest interval or upper interval of an open-ended distribution. A statistical test is not appropriate.

7. An '*****' entry in the margin of error column indicates that the estimate is controlled. A statistical test for sampling variability is not appropriate.

8. An 'N' entry in the estimate and margin of error columns indicates that data for this geographic area cannot be displayed because the number of sample cases is too small.

The 2006 American Community Survey universe is limited to the household population and excludes the population living in institutions, college dormitories, and other group quarters. Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value.



EXHIBIT
B

Custom Table - American FactFinder

9. An 'X' means that the estimate is not applicable or not available.

Detailed Tables - American FactFinder

http://factfinder.census.gov/servlet/DTTable?_bm=y&-state=dt&-context=dt&-ds_name=...

1 of 1

## U.S. Census Bureau
### American FactFinder

| Main | Search | Feedback | FAQs | Glossary | Site Map | Help |

B25003. TENURE - Universe: OCCUPIED HOUSING UNITS
Data Set: 2006 American Community Survey
Survey: 2006 American Community Survey

NOTE. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.

| | El Paso city, Texas | |
|---|---|---|
| | Estimate | Margin of Error |
| Total: | 195,667 | +/-2,766 |
| Owner occupied | 119,894 | +/-3,098 |
| Renter occupied | 75,773 | +/-3,580 |

Source: U.S. Census Bureau, 2006 American Community Survey

Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see Accuracy of the Data). The effect of nonsampling error is not represented in these tables.

While the 2006 American Community Survey (ACS) data generally reflect the December 2005 Office of Management and Budget (OMB) definitions of metropolitan and micropolitan statistical areas, in certain instances the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB definitions due to differences in the effective dates of the geographic entities.

Explanation of Symbols:
1. An '***' entry in the margin of error column indicates that either no sample observations or too few sample observations were available to compute a standard error and thus the margin of error. A statistical test is not appropriate.
2. An '-' entry in the estimate column indicates that either no sample observations or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest interval or upper interval of an open-ended distribution.
3. An '-' following a median estimate means the median falls in the lowest interval of an open-ended distribution.
4. An '+' following a median estimate means the median falls in the upper interval of an open-ended distribution.
5. An '***' entry in the margin of error column indicates that the median falls in the lowest interval or upper interval of an open-ended distribution. A statistical test is not appropriate.
6. An '*****' entry in the margin of error column indicates that the estimate is controlled. A statistical test for sampling variability is not appropriate.

Standard Error/Variance documentation for this dataset:
2006 Accuracy of the Data

EXHIBIT
C

Detailed Tables - American FactFinder

http://factfinder.census.gov/servlet/DTTable?_bm=y&-state=dt&-context=dt&-ds_name=...

**U.S. Census Bureau**
American FactFinder

| Main | Search | Feedback | FAQs | Glossary | Site Map | Help |

B25003I. TENURE (HISPANIC OR LATINO HOUSEHOLDER) - Universe: OCCUPIED HOUSING UNITS WITH A HOUSEHOLDER WHO IS HISPANIC OR LATINO

Data Set: 2006 American Community Survey

Survey: 2006 American Community Survey

NOTE: For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.

|  | El Paso city, Texas | |
|  | Estimate | Margin of Error |
| Total: | 145,639 | +/-2,911 |
| Owner occupied | 86,635 | +/-2,806 |
| Renter occupied | 59,004 | +/-3,250 |

Source: U.S. Census Bureau, 2006 American Community Survey

Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see Accuracy of the Data). The effect of nonsampling error is not represented in these tables.

While the 2006 American Community Survey (ACS) data generally reflect the December 2005 Office of Management and Budget (OMB) definitions of metropolitan and micropolitan statistical areas, in certain instances the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB definitions due to differences in the effective dates of the geographic entities.

Explanation of Symbols:
1. An '***' entry in the margin of error column indicates that either no sample observations or too few sample observations were available to compute a standard error and thus the margin of error. A statistical test is not appropriate.
2. An '-' entry in the estimate column indicates that either no sample observations or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest interval or upper interval of an open-ended distribution.
3. An '-' following a median estimate means the median falls in the lowest interval of an open-ended distribution.
4. An '+' following a median estimate means the median falls in the upper interval of an open-ended distribution.
5. An '****' entry in the margin of error column indicates that the median falls in the lowest interval or upper interval of an open-ended distribution. A statistical test is not appropriate.
6. An '*****' entry in the margin of error column indicates that the estimate is controlled. A statistical test for sampling variability is not appropriate.

**Standard Error/Variance documentation for this dataset:**
2006 Accuracy of the Data

http://factfinder.census.gov/servlet/DTTable?_bm=y&-state=dt&-context=dt&-ds_name=...

# U.S. Census Bureau
## American FactFinder

| Main | Search | Feedback | FAQs | Glossary | Site Map | Help |

B25003H. TENURE (WHITE ALONE, NOT HISPANIC OR LATINO HOUSEHOLDER) - Universe:
OCCUPIED HOUSING UNITS WITH A HOUSEHOLDER WHO IS WHITE ALONE, NOT HISPANIC
OR LATINO
Data Set: 2006 American Community Survey
Survey: 2006 American Community Survey

NOTE: For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.

| | El Paso city, Texas | |
|---|---|---|
| | Estimate | Margin of Error |
| Total: | 40,043 | +/-1,811 |
| Owner occupied | 28,544 | +/-1,867 |
| Renter occupied | 11,499 | +/-1,487 |

Source: U.S. Census Bureau, 2006 American Community Survey

Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see Accuracy of the Data). The effect of nonsampling error is not represented in these tables.

While the 2006 American Community Survey (ACS) data generally reflect the December 2005 Office of Management and Budget (OMB) definitions of metropolitan and micropolitan statistical areas, in certain instances the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB definitions due to differences in the effective dates of the geographic entities.

Explanation of Symbols:
1. An '**' entry in the margin of error column indicates that either no sample observations or too few sample observations were available to compute a standard error and thus the margin of error. A statistical test is not appropriate.
2. An '-' entry in the estimate column indicates that either no sample observations or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest interval or upper interval of an open-ended distribution.
3. An '-' following a median estimate means the median falls in the lowest interval of an open-ended distribution.
4. An '+' following a median estimate means the median falls in the upper interval of an open-ended distribution.
5. An '***' entry in the margin of error column indicates that the median falls in the lowest interval or upper interval of an open-ended distribution. A statistical test is not appropriate.
6. An '******' entry in the margin of error column indicates that the estimate is controlled. A statistical test for sampling variability is not appropriate.

**Standard Error/Variance documentation for this dataset:**
2006 Accuracy of the Data