**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

**EL PASO APARTMENT ASSOCIATION, et al.,** §
　　　　　　　　　　　　　　　　　　　　§
　　　　　　　　　　**Plaintiffs,** §
　　　　　　　　　　　　　　　　　　　　§
v.　　　　　　　　　　　　　　　　　　 §　　　　No. EP-08-CA-0145-DB
　　　　　　　　　　　　　　　　　　　　§
**CITY OF EL PASO, et al.,** §
　　　　　　　　　　　　　　　　　　　　§
　　　　　　　　　　**Defendants.** §

**PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TO THE HONORABLE DAVID BRIONES, UNITED STATES DISTRICT JUDGE:**

　　　　Come now EL PASO APARTMENT ASSOCIATION, et al., Plaintiffs, and file this their

Response to Defendants' motion for summary judgment, and would show the following:

　　　　Plaintiffs are owners and managers of apartment complexes, and their trade industry group.

In 2008, the City of El Paso began charging a stormwater fee to its residents; but those who reside

in apartment complexes and structures of four or more residential units are charged on a different

basis than those who reside in single-family homes, duplexes, and triplexes.  Specifically, smaller

residential structures are charged on the basis of the size of their structure (excluding driveways and

walkways and other external impervious surface areas), while apartment complexes are charged on

the basis of the entire impervious surface area of the property (including driveways and walkways

and other external impervious surface areas).  On a per-square-foot basis, a typical apartment

complex will pay more than twice the amount paid by a typical residential subdivision of equivalent

area, even though the stormwater drainage cost imposed on the city is the same for each square foot

of impervious surface area.  There is no rational basis for Defendants' distinct treatment of larger

residential structures and smaller residential structures, in violation of Plaintiffs' right of equal protection of the laws.  The fee structure also has a discriminatory disparate impact on minorities, in violation of the Fair Housing Act, as a greater percentage of minorities live in apartment complexes as compared to single-family homes.  And the fee is used to generate revenue in excess of the cost of providing the service to the one paying the fee, making the fee in reality an unlawful tax under Texas law.  Pursuant to Local Rule CV-7(b), the evidentiary support for this motion is included in Plaintiffs' appendix to this response, filed contemporaneously with the submission of this response.  Defendants' motion for summary judgment should be denied.

**A.   Factual background**

Plaintiffs are the owners and managers of apartment complexes located in the City of El Paso, and the trade industry group representing apartment owners and managers.  Plaintiffs' properties are "residential" in that they are used as residences, and they are classified as residential throughout the industry.  (Bowling dep. p. 59).  El Paso Municipal Code provisions and regulations also categorize these properties as residential, including zoning regulations, subdivision ordinances, and building codes.  (Kistenmacher dep. p. 74; Kistenmacher report p. 3; Adauto dep. p. 15; Archuleta dep. p. 103).  Nonetheless, Defendants adopted a stormwater fee rate structure which classifies Plaintiffs' properties as non-residential.  (Def. m.s.j. p. 4; Archuleta dep. p. 105).

Defendants' stormwater fee classification structure draws the line between residential and non-residential properties based upon how many residential units are located on the premises; triplexes and smaller are categorized as residential, while quadruplexes and larger are categorized as non-residential.  (Def. m.s.j. p. 4).  Notably, the distinction is based only on the number of residential units on the property, and is not based on whether the property is used commercially; rental homes, rented duplexes, and rented triplexes are categorized as residential, while properties

containing more units are categorized entirely as non-residential regardless of whether any of the units are occupied by the property's owner.  (Def. m.s.j. p. 4).

The distinction is also not based on any difference in costs imposed on the stormwater drainage system.  A square foot of impervious surface area imposes the same stormwater drainage cost on the city regardless of where it is located, and regardless of whether it is in front of a single-family home or in front of an apartment complex.  (Giardina dep. p. 4).

As a consequence of the categorization, however, Plaintiffs pay fees for stormwater drainage which residential properties do not pay.  Specifically, Plaintiffs and other properties classified as non-residential have their fees assessed based on a measurement of the total impervious surface area of the property, which includes the structure and all paved parking and walking areas.  (Def. m.s.j. p. 4-5; Giardina dep. p. 103; Costanzo dep. p. 86-87; Archuleta dep. p. 80).  By contrast, properties classified as residential have their fees assessed based on the square footage of the property derived from El Paso Central Appraisal District information ("CAD" data).  (Def. m.s.j. p. 4).  A known limitation of the CAD data is that it only provides the square footage of the residential structure and adjacent structures on the property, and does not include exterior impervious surface area, such as driveways and walkways, patios, storage sheds, or paved yard areas.  (Kistenmacher dep. p. 49-50; Costanzo dep. p. 84-86; Def. m.s.j. p. 5).  Exterior paved surfaces at property characterized as residential are therefore not included in the assessment of impervious surface area on which the fee is based.  (Giardina dep. p. 80-81; Archuleta dep. p. 80).  Consequently, costs associated with paved surfaces exterior to single-family residences are not charged to those residences, but are spread to all ratepayers, including non-residential class ratepayers.  (Giardina dep. p. 76-77).  In fact, a majority of the cost imposed by impervious surface area in front of residential properties is paid by non-residential customers.  (Giardina dep. p. 78-79).

3

The difference is not insubstantial.  When a typical apartment complex is compared to a typical residential subdivision of equivalent size, the apartments have about 1.14 times as much impervious surface area as the single-family homes within the subdivision.[1]  (Inj. hrg. p. 5-7).  However, the stormwater fees paid by the owners or residents of the apartment complex under the present rate structure are 3.83 times as much as those paid by the owners or residents of the single-family residences.[2]  (Bowling dep. p. 58; Inj. hrg. p. 7-8).  Even if public streets are deducted from the impervious area of the subdivision, the apartment complex has only 1.74 times as much impervious surface area as the subdivision, but still pays fees of 3.83 times as much – in other words, it pays more than twice as much per square foot as the property classified as residential by the rate structure.  (Inj. hrg. p. 13).

As detailed herein, there is no rational basis for the distinction between the fees charged to Plaintiffs' properties and the fees charged to smaller residential properties, in violation of the Plaintiffs' right of equal protection of the laws.  Furthermore, because a disproportionate number of the residents of Plaintiffs' properties are racial and ethnic minorities, compared to properties classified as residential, the fees charged have a disparate impact on minorities, in violation of the Fair Housing Act.

Moreover, the fees charged to Plaintiffs do not correspond to the costs of providing stormwater service to their properties.  Instead, Defendants have adjusted the fees in a variety of

---

[1] The apartment complex utilized for this comparison, Castner Palms, actually has one of the highest proportions of impervious cover, as compared to other apartment complexes surveyed by Defendants.  (See Def. m.s.j. ex. G, p. 10).  Accordingly, this estimate of the ratio of impervious surface area for an apartment complex compared to a typical residential subdivision is actually a conservative figure in favor of Defendants.

[2] Under the rate structure originally created by Defendants, the apartment residents paid 3.73 times as much; under the amended structure effective in June 2008, the ratio increased so that the apartment residents pay 3.83 times as much stormwater fee.  (Bowling dep. p. 58; Inj. hrg. p. 7-8).

4

ways to account for revenue goals, public policy determinations, and for external legal prohibitions. The use of the fee structure to raise revenue and to accommodate policy initiatives, rather than to pay the cost of stormwater service provided to the person paying the fee, establishes that the "fee" is in reality a tax under Texas law.  The fee was not adopted pursuant to Texas laws governing adoption of tax rates, making it an illegal tax under state law.

Genuine fact issues permit a reasonable jury to conclude that the stormwater fee violates equal protection, violates the Fair Housing Act, or is a tax rather than a fee under Texas law. Defendants' motion for summary judgment should be denied.

**B.      Summary judgment standard.**

A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact.  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  An issue is material if its resolution could affect the outcome of the action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In reviewing a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.  *Reeves v. Sanderson Plumbing Prods. Co.*, 530 U.S. 133, 150 (2000).  The Court must disregard all evidence favorable to the moving party that the jury is not required to believe.  *Id.*

**C.      Genuine fact issues preclude summary judgment on the equal protection claim.**

The equal protection guarantee of the Fourteenth Amendment prohibits the state from "deny[ing] any person within its jurisdiction the equal protection of the laws."  U.S. Const. amd. XIV, § 1.  With reference to a governmental action, this language has been interpreted to mean that "all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.,*

*Inc.,* 473 U.S. 432, 439 (1985).  The protections of the clause extend to administrative as well as legislative acts.  *Engquist v. Oregon Dept. of Agric.*, __ U.S. __, 128 S.Ct. 2146, 2150 (2008).

Significantly, "The Equal Protection Clause safeguards not merely against such invidious classifications as race, gender and religion, but any arbitrary classification of persons for unfavorable governmental treatment."  *Hayden v. Grayson,* 134 F.3d 449, 453 n. 3 (1st Cir. 1998).  However, when the classification drawn by a governmental action does not involve such a suspect or quasi-suspect classification, the regulation is reviewed only for whether it has a rational basis.  *See Texas Manufactured Housing Ass'n v. City of Nederland*, 101 F.3d 1095, 1106 (5th Cir. 1996).

Thus, when governmental entities enact regulations that distinguish between different groups of landowners, the Constitution requires that there be a rational basis for the distinction, based on distinguishing characteristics which are relevant to the interests that the governmental body has authority to implement.  *See generally City of Cleburne*, 473 U.S. at 440.  A classification violates the Equal Protection clause of the constitution unless there is a rational relationship between the disparity of treatment of the classes and a legitimate public purpose.  *See Board of Trustees, Univ. of Alabama v. Garrett*, 531 U.S. 356 (2001).  Defendants' imposition of a stormwater fee on Plaintiffs which differs from the fee imposed on other properties used for residential purposes violates equal protection, because there is no rational basis for the distinction between residences of three or less units and residences of four or more units.

Defendants' fee structure makes a distinction between properties classified as residential, and properties classified as non-residential, based on the number of residential units in the property. (Def. m.s.j. p. 4).  Defendants charge stormwater fees to properties used as residences but characterized as "non-residential" properties, including the multi-unit residences owned and managed by Plaintiffs, at a different rate than the fees charged to properties characterized as

6

"residential" properties.  More specifically, Plaintiffs' properties are charged a stormwater fee based on the total impervious surface area of the property, while single-family residences are charged a fee based only on the area of the structure, excluding other impervious surface areas on the property. (Def. m.s.j. p. 4-5).  The distinction is made despite the fact that the properties impose the same cost per square foot on the stormwater drainage function.  (Giardina dep. p. 4). The distinction is made despite the fact that Plaintiffs' properties are in fact "residential" as that term is commonly used and as it is used in the industry, and are characterized as such for most municipal regulation.  (Bowling dep. p. 59; Kistenmacher dep. p. 74; Kistenmacher report p. 3; Adauto dep. p. 15; Archuleta dep. p. 103). As a result, Plaintiffs pay substantially more than other properties used for residential purposes, and subsidize the stormwater cost imposed on the City by residential properties with fewer units. (Bowling dep. p. 58; Inj. hrg. p. 5-8, 13; Giardina dep. p. 76-79).

Defendants' summary judgment motion lists eight bases for the classification they have imposed.  Specifically, Defendants' summary judgment motion claims that it was rational to (1) use the existing EPWU water and wastewater billing system in order to get fees in place by March 1, 2008; (2) use the existing EPWU billing system so customers could receive a single utility bill; (3) follow the class designations of customer meters in the EPWU billing system; (4) distinguish apartment complexes from residential properties because individual apartment units typically are not separately metered; (5) use the CAD data for residential properties; (6) not use CAD data for apartments; (7) distinguish apartment complexes from residential class properties because apartments are for-profit businesses; and (8) distinguish apartments because they "can" have large proportions of impervious cover.  (Def. m.s.j. p. 16-17). Some of these reasons do not even relate to the distinction that has been made by the stormwater fee structure; others represent arbitrary distinctions, rather than providing rational bases for the classifications that have been made.

Most of these "bases" for the classification provide no explanation at all for the distinction in the fees charged. Defendants' first four explanations argue that it was justified in using the EPWU billing system and the customer designations of that system, and suggests that the limitations of that system (i.e., the lack of individual meters for apartment complexes) justify the classification.[3] But Plaintiffs do not challenge the use of the EPWU billing system. They challenge only the decision to charge them different rates than those customers designated as residential within that system. In fact, Defendants undercut their own argument that the class designations of the EPWU billing system justify the distinction in rates, by arguing that "It doesn't matter what the classes are called." (Def. m.s.j. p. 17). On this, at least, the parties can agree; what matters is the decision to treat the classes differently, not the titles applied. It is equally irrelevant which billing system is used to apply the unequal rates, or whether the billing system calls the classes by different names. The use of the EPWU billing system provides no basis at all for the charging of different rates to different classes within that system.

Defendants' seventh justification for the difference in rates charged is that apartments are commercial, for-profit businesses. In fact, Defendant Ed Archuleta, president and CEO of the Public Service Board, has testified that the "bottom line" reason for charging residences classified as non-residential at a different rate from properties classified as residential is that apartments are "commercial for-profit organizations." (Inj. hrg. p. 32-33). However, the rate structure does not distinguish between for-profit enterprises and owner-occupied residences; it distinguishes between properties containing three or fewer residential units, and those containing four or more. (Def. m.s.j. p. 4). Single-family homes and duplexes or triplexes that are rented for a profit are within the

---

[3] This portion of Defendants' motion also argues that it used the EPWU billing system because of the short time period to implement the stormwater billing system. However, its deadline to do so was arbitrarily selected by the City, and was not required by any external constraint.

"residential" category.   In fact, at least twenty percent of the properties within Defendants' residential classification are not owner-occupied.[4]  By contrast, any quadruplexes in which all units are occupied by the owner and his family members would remain within the non-residential category. Many of the apartment complexes who are Plaintiffs in this suit are low-income housing units subject to government-imposed rental rate caps, and the properties often do not earn a profit. (Bowling dep. p. 34-35, 38-39, 51, 69-70).  Defendants have done nothing to determine whether any particular property is rented for commercial purposes or whether it is profitable in deciding whether to charge the property the non-residential rate; that decision is based only on the number of residential units within the property.  (Def. m.s.j. p. 4).  The impervious cover is measured and the rates are applied based on the rate class, regardless of whether they are for-profit businesses. (Kistenmacher dep. p. 72).  The cost imposed on the stormwater drainage system by runoff from a property also has nothing to do with whether that property is a commercial for-profit business or a residential home.  (Kistenmacher dep. p. 71-72).  The fact that some of the properties characterized as non-residential may be profitable, and some of the properties characterized as residential may not be for-profit commercial enterprises, does not provide any basis for the distinction actually made by the rate structure between properties of three-or-less units and properties of four-or-more units.

Defendants' eighth rationalization for the distinction is also meaningless.  They assert that apartments "can" have large proportions of impervious cover.  In support, they point to their own

---

[4] According to United States Census data, for the period of 2005-2007, there were 155,617 to 164,639 housing units that would fall within Defendants' residential category (census data includes triplexes and quadruplexes within the same category). (Appx. Ex. 10 p. 1).  However, there were only 123,118 owner-occupied units. (Appx. Ex. 10 p. 2).  In the 2000 census, there were 102,012 owner-occupied units, and 139,635 to 147,572 properties which would fall within the residential category. (Appx. Ex. 9 p. 1-2).  Even if one assumes that all of the owner-occupied units are within Defendants' residential category, a minimum of 20 percent and up to 30 percent of these properties are not owner-occupied.  However, Defendants' rate classes make no distinction between owner-occupied properties and rental properties.

powerpoint presentation, which itself claims that fourteen particular apartment complexes (selected in an unspecified and unknown fashion) have impervious cover of forty to eighty percent. Defendants provide no analysis of whether single-family residences also "can" have large proportions of impervious cover. In fact, they can, since they may have impervious areas in addition to the structure such as driveways, walkways, patios, storage sheds, and even concrete yards, none of which are measured by the CAD data used to calculate the residential stormwater fee rates. (Kistenmacher dep. p. 49-50). Defendants provide no reason to believe that the impervious cover of any given single-family residence, or single family residences as a whole, is proportionately less than the impervious cover of any particular apartment complex, or apartment complexes as a whole. Defendants do not charge classes of properties different rates based on the properties' percentage of impervious cover. The simple statement that some apartment complexes "can" have large proportions of impervious surface area does not distinguish them from single-family residences which also can have large proportions of impervious cover. This explanation therefore also does not provide any reasonable basis for treating properties of four-or-more residential units differently from properties of three-or-fewer units.

The heart of Defendants' explanation for the use of different rates has been in the fifth and sixth justifications for the decision stated in its motion, that CAD data was used for residential properties, while more exact measurements were used for non-residential properties. According to Defendants' ratemaking consultant, this was actually the basis for the distinction between the residential and non-residential categories. (Inj. hrg. p. 43-44). For residential properties, CAD data is used to determine the square footage on which the properties are charged. (Def. m.s.j. p. 5; Inj. hrg. p. 44). A known limitation of CAD data is that it includes the square footage of structures on the property, but does not include the square footage of driveways, walkways, or other paved or

impervious surface area in the properties.  (Kistenmacher dep. p. 49-50; Def. m.s.j. p. 5).  For non-residential properties, therefore, Defendants measured actual total impervious surface area, including driveways, walkways, and other paved areas.  (Def. m.s.j. p. 5-6; Inj. hrg. p. 44).  Defendants argue that it is impractical to measure total impervious surface area for all properties, and that Texas law permits them to use CAD data, but that they preferred to use more precise data for non-residential properties.

While perhaps superficially appealing, closer examination reveals that this decision provides no reasonable basis for the classifications chosen, because it does not provide a basis for charging Plaintiffs a fee based on surface area which is not also billed to single-family residences.  For purposes of summary judgment, Plaintiffs will accept as true Defendants' assertion that it would be impractical to measure actual surface area for all of the properties it classifies as residential.  But this does not provide a basis for charging Plaintiffs a fee for the surface area which those properties are immune from paying.  Since CAD data is available for all properties, it would have been even more efficient for Defendants to utilize the same data for Plaintiffs' properties as well.  Alternatively, Defendants could have assessed a fee to those properties based on a survey of representative properties.  (Kistenmacher dep. p. 52-53).  The City possesses the physical and technical ability to do so.  (Costanzo dep. p. 94).  Barring either of these suggestions, however, Defendants' actual measurements of properties used as residences but classified as non-residential should have measured the same area which is included in the CAD data for those properties classified as residential, and excluded those areas which the CAD data is known to exclude for those properties classified as residential.  Defendants would not need any additional measurements or data which are not already in their possession to derive the amount of exterior paved surfaces for those apartments

11

and residences which it classifies as non-residential, and determine the revenue attributable to those exterior paved surfaces. (Giardina dep. p. 103-04).

Despite knowing that CAD data includes only structures and excludes external impervious surface area, Defendants measured and assess a fee on all impervious surface areas for Plaintiffs' property, including those areas excluded from CAD data. Using CAD data for one category of property while measuring the same area for another category of property is justifiable; but using CAD data which includes *only certain portions of the impervious surface area* for one category of residential properties, while actually measuring square footage of *total impervious surface areas* for another category of residential properties, is unexplained, unjustified, and inexcusable. Defendants' fifth and sixth reasons stated for its decision, at bottom, only describe the classifications it chose to impose, and provide no rational basis for charging different rates to those classifications.

Stated differently, Defendants argue that the same "unit rate" is assessed regardless of rate class. (Def. m.s.j. p. 17). Defendants cite to the portions of the report of their ratemaking consultant, Richard Giardina, emphasizing that the unit cost is the same citywide. (Def. m.s.j. p. 17, citing Giardina report pp. 4-1, 4-8). However, as Giardina explained, this portion of the report refers to the cost per square foot of providing the service. (Giardina dep. p. 62-63). While the cost per square foot is uniform, the number of "units" on which the rate is charged differs for the different classes. (Giardina dep. p. 62-63). The "unit" on which the rate is charged for property classified as residential is based on CAD data, which provides the area covered by the structure, excluding driveways, walkways, and other impervious surface areas outside of the structure. The "unit" on which the rate is charged for property classified as non-residential is based on site measurements of that property, which includes these additional areas omitted from the measurement of the residential class. (Def. m.s.j. p. 4-5). There is no rational basis for Defendants' decision to measure and charge

a fee for these additional areas for Plaintiffs' property while intentionally choosing to rely on data excluding those areas for other property used for residential purposes.

Defendants' justifications provide no rational basis for measuring and assessing a fee based on the total impervious surface areas for Plaintiffs' properties (which are used for residential purposes), while using data which it knows excludes certain impervious surface area for properties it chooses to characterize as residential. Where a city's explanations fail to adequately provide any rational basis for a distinction in the treatment resulting from its classifications of people, the classifications will fail the requirement of equal protection. *See generally City of Cleburne*, 473 U.S. at 448-50 (finding equal protection violation when proffered reasons for treatment of certain group-home residents did not adequately explain why they were treated differently from other group homes). Plaintiffs pay a grossly excessive fee per square foot of impervious surface area in comparison to the fees assessed on property characterized as residential, even though the cost per square foot that these properties impose on the stormwater drainage system is identical. A reasonable jury could find that there is no rational basis for this difference in the treatment of properties, and thus, Defendants' fee structure violates equal protection. *See Reid v. Rolling Fork Public Utility Dist.*, 854 F.2d 751, 755 (5th Cir. 1988) (whether there was a rational basis for district decision argued to violate equal protection to be resolved by a properly-instructed jury). Defendants' motion for summary judgment should be denied.

**D.      Genuine fact issues preclude summary judgment on the Fair Housing claim.**

Defendants' calculation and assessment of the storm water drainage fee violates Title VIII of the Civil Rights Act of 1968 (also referred to as "The Fair Housing Act" or the "Act"). The Act prohibits discrimination on the basis of race, color, or national origin, in the terms, privileges or conditions of the sale or rental of a dwelling, and in the provision of services or facilities in

connection therewith.  42 U.S.C. § 3604.  The Act applies to municipalities including Defendants. *Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988), *cert. denied*, 493 U.S. 813 (1988); *United States v. City of Parma*, 661 F.2d 552 (6th Cir. 1981), *cert. denied*, 456 U.S. 926 (1982).  The Act prohibits facially neutral policies, practices and laws that have a disparate impact on the basis of race, color, or national origin.  *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996).  Defendants' imposition of different stormwater charges on apartments than is imposed on single-family residences has a disparate impact on racial minorities, because Plaintiffs' residents are disproportionately racial and ethnic minorities, compared to the residents of property classified as residential.

Defendants seek to avoid liability on several bases: they claim (1) there is no difference between the population of minority households in apartments and those in the city as a whole; (2) that there is no discriminatory impact, based on their attack on the statistical reliability of the census data; (3) that there can be no discriminatory disparate impact where the majority of those favored by a regulation are of the same race or ethnicity as the majority of those disfavored, even if the groups are not proportionate; or (4) the discrimination is too small to matter, considering the purpose of the stormwater fee.  Each of these rationalizations should be rejected.

The relevant comparison group is not the population of El Paso as a whole; instead, the relevant comparison is between those who pay higher rates (residences of complexes of four or more units, including Plaintiffs' tenants) and those who pay lower rates (residents of single-family residences, duplexes, and triplexes).  The authority cited by Defendants is distinct; in this case, Plaintiffs do not complain simply that a regulation standing by itself has a disparate impact on persons of a particular race or ethnicity, but rather, that a regulation creates two classes and treats the two classes differently, resulting in a disparate impact.  In this context, the appropriate

comparison for determining whether the regulation has a disparate impact is between the demographics of the two classes created by the regulation. *See Betsey v. Turtle Creek Associates*, 736 F.2d 983, (4th Cir. 1984) (relevant comparison was between tenants evicted and those not evicted in particular building at issue, not population of community as a whole); *Summerchase Ltd. Partnership I v. City of Gonzales*, 970 F.Supp. 522, 530 (M.D. La. 1997) (explaining that relevant population for disparate impact analysis focuses on those affected by regulation, rather than entire region). A Fair Housing Act violation occurs when a decision has a greater adverse impact on one group than another. *Graoch Associates # 33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n*, 508 F.3d 366, 378 (6th Cir. 2007).

When the appropriate comparison is made, the distinction between classes of ratepayers in Defendants' stormwater fee regulation has a disparate impact on minority residents. Defendants' own summary judgment proof indicates that, based on 2007 American Community Survey data provided by the United States census bureau, 77.4 percent of the residents of structures with two or fewer units are members of a minority class, while 83.0 percent of the residents of structures including five or more units are minority class members (the census data combines residents of triplexes and quadruplexes). (Def. m.s.j. ex. H, Tables 1-2). Defendants attack this data based on their view of its "statistical uncertainty." However, Fair Housing Act cases commonly rely on United States census data to determine whether an action is discriminatory. *See, e.g., Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1060 (4th Cir. 1982) (relying on census data for ethnicity of city and county); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 131-33 (3rd Cir. 1977) (describing population of area as revealed by each census). In *National Fair Housing Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F.Supp.2d 46, 60-61 (D. D.C. 2002), the Court found that United States census data was sufficient to demonstrate segregation for purposes of stating a disparate

15

impact claim under the Fair Housing Act.  Many of Plaintiffs' properties are tax-credit/low-income complexes, for which the owners are required to report racial and ethnic makeup of their tenants to the State on a quarterly basis; for these properties, the minority population typically represents 97 to 98 percent of the total.  (Inj. hrg. p. 16).  The evidence is sufficient to permit a reasonable jury to find that the fee structure which charges these persons at a higher rate than residents of single-family homes, duplexes and triplexes has a discriminatory impact on minorities.

Defendants also make the strange argument that there can be no discrimination in El Paso because the population of the City as a whole is majority-minority; in other words, that protected classes under the Fair Housing Act comprise a majority of the city's population, and therefore, regulations which have a disparate impact against members of that minority group are lawful.  The only case it cites does not stand for this broad proposition.  *Graoch Associates # 33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n*, 508 F.3d 366 (6th Cir. 2007).  That case merely held that no discrimination had occurred on the facts of the case, because the group affected by the policy challenged had the same racial makeup as those not affected in the relevant comparison group.  *Id*. at 378-79.  A holding that discrimination against minorities can not occur in a majority-minority population would grant property owners free reign to discriminate against Hispanics in El Paso (or to discriminate against the majority group of any city).  The Fair Housing Act protects all residents, not just those who happen to be the minority in the city where the action is brought.  *See Jordan v. Khan*, 969 F.Supp. 29, 30-31 (N.D. Ill. 1997) (explaining that white plaintiff could sue for housing discrimination under FHA); *Simpson v. Flagstar Bank*, 2003 WL 22244789 at *4 n. 2 (S.D. Ind. 2003) (same).  Defendants' attempt to immunize discrimination simply because the victims of a policy with a discriminatory impact happen to be within the majority within this geographic region is legally unsupported, and should be rejected.

Defendants also argue that they may not be held liable for discrimination because any discriminatory impact is insubstantial compared to their interest in furthering the rates. However, this analysis focuses on the interest in providing stormwater drainage, rather than any interest in a fee structure which charges apartment residents more for that service; and the effect a hypothetical nondiscriminatory rate structure would have on its budget as a whole, rather than the impact its existing structure has on apartment residents. Both aspects of this analysis are flawed.

There is no dispute that the city has an interest in providing stormwater drainage. There is no dispute that it may fund this service through appropriately-measured fees or taxes. However, the city has no interest in charging apartment dwellers a higher fee for the same service than it imposes on residents of single-family homes. A single square foot of impervious surface area imposes the same stormwater drainage cost on the city, wherever it is located. (Giardina dep. p. 4). But residents of multi-unit complexes are charged a fee based on every square foot of impervious surface area of the property, while residents of triplexes, duplexes, and single-family residences are charged a fee based only on the square footage of the structure, excluding driveways, walkways, and other impervious surface area outside of the structure. (Def. m.s.j. p. 4-5). In fact, a majority of the cost imposed by impervious surface area in front of residential properties is paid by customers classified as non-residential. (Giardina dep. p. 78-79). There is no governmental interest in charging more to apartment residents simply because of the number of residential units in the structure where they reside.

Defendants also claim that charging smaller residences for driveways would add four percent to the impervious surface area for which it bills city-wide, based on an unexplained hypothetical 200 square-foot driveway adjustment. This hypothetical is understated; a property characterized as residential can conservatively be estimated to have at least 500 square feet of impervious surface area

not included in the CAD data.[5]  More importantly, even if Defendant's figure had some basis, the materiality of the disparate impact should not be judged based on whether it will have an overall impact on Defendants' budget, and indeed, the small size of the overall impact on its budget makes the discriminatory impact less justifiable.  Instead, the appropriate question is the disparate impact on the persons paying stormwater fees at a higher rate.  When a typical apartment complex is compared to a typical residential subdivision of equivalent size, the apartments have about 1.14 times as much impervious as the single-family homes within the subdivision.  (Inj. hrg. p. 5-7).  However, the stormwater fees paid by the owners or residents of the apartment complex are 3.83 times as much as those paid by the owners or residents of the single-family residences.  (Bowling dep. p. 58; Inj. hrg. p. 7-8).  Even if public streets are deducted from the impervious area of the subdivision, the apartment complex will have only 1.74 times as much impervious surface are as the subdivision, but it is assessed fees of 3.83 times as much.  (Inj. hrg. p. 13).  Requiring apartment residents to pay more than twice as much per square foot of impervious surface area, despite the fact that the costs per square foot imposed on the stormwater drainage system is the same, is not a *de minimis* discriminatory impact.

Defendants relatedly argue, without evidentiary support or citation to legal authority, that residents of apartment complexes should be treated differently because the properties where they

---

[5] The El Paso municipal code requires each single-family residence to have at least two off-street parking spaces.  (See El Paso Munic. Code § 20.14.050 & appx. C to ch. 20).  This is universally or almost universally provided for with a two-car garage, which is 16 to 20 feet wide. The code also requires a single-family residence to be set back from the street at least 25 feet.  (See El Paso Munic. Code § 20.12.020 & appx. B to ch. 20).  Typically, the driveway runs this distance across the setback from the street to the garage, resulting in 400 to 500 square feet of driveway area. Single-family residences also typically have some sort of concrete, paved, or stone walkway from the door to the driveway or sidewalk.  In addition, single-family residential lots are often separated by rock walls, and are required to be so divided for certain recently-built subdivisions.  While these rock walls are only one foot wide, a typical lot will have at least 100 linear feet of wall, adding 100 or more square feet to the impervious surface area.

reside have higher proportions of impervious cover than "typical residential lots."  There is no evidence and no reason to believe that there is any distinction in the proportion of impervious cover between typical single family residences, duplexes, or triplexes, and quadruplexes or larger.  More importantly, even if there is some difference, that difference does not provide any legal justification for charging residents of the property categorized as non-residential a higher rate which is disproportionate to the higher percentage of impervious cover.  Charging a fee based on the square feet of impervious surface area fully accounts for any excess cost imposed by properties with a higher percentage of impervious surface area; the decision not to charge residents of smaller properties for some of their impervious surface area is not justified by the speculative assumption that their overall proportion of impervious surface area is less than that of larger properties.

Nor is Defendants' argument that there are no meaningful alternatives persuasive. Defendants argue that it would be impractical to measure the impervious surface area of the properties it characterizes as residential, and therefore it chose to use CAD data.  However, one obvious alternative to using CAD data only for properties classified as "residential," while measuring all impervious surface area at residences classified as "non-residential," is to use the same CAD data for all these properties.  A second obvious alternative is to measure the same areas known to be included within by CAD data for the properties characterized as non-residential (i.e., measuring the area of the structures, and omitting driveways, parkways, and other areas omitted from CAD measurements).  Defendants would not need any additional measurements or data which are not already in their possession to derive the amount of exterior paved surfaces for those apartments and residences which it classifies as non-residential, or to determine the revenue attributable to those exterior paved surfaces.  (Giardina dep. p. 103-04).  A third alternative it so perform a survey of representative properties to determine the typical amount of impervious surface area not accounted

for by CAD data.  (Kistenmacher dep. p. 52-53).  The City possesses the physical and technical

ability to do so.  (Costanzo dep. p. 94).  Charging residents of apartment complexes a fee based on

certain impervious surface areas while using CAD data omitting these areas in assessing the fees to

residents of smaller housing units is certainly not the only "meaningful" way to assess fees, and has

a discriminatory impact on the residents of homes classified as "non-residential."

A reasonable juror may find that Defendants' imposition of higher stormwater fees on

Plaintiffs' multi-unit residential complexes than on single-unit residences has a discriminatory

impact on the residents of those properties, in violation of the Fair Housing Act.  Defendants' motion

for summary judgment should be denied.

**E.     Genuine fact issues preclude summary judgment on the illegal-tax claim.**

In addition, the "fee" charged by Defendants is unlawful because in reality it is not a "fee"

at all under Texas law, but rather, a tax which was not adopted in accordance with Texas law

imposing requirements for the assessment and collection of taxes.  To determine whether an exaction

authorized by statute or ordinance constitutes an occupation tax or a license fee, the test is whether

the primary purpose of the exaction, when the statute or ordinance is considered as a whole, is for

regulation or for raising revenue.  *City of Houston v. Harris County Outdoor Advertising*, 879

S.W.2d 322, 326 (Tex.App.–Houston [14th Dist.] 1994, writ denied), *citing Hurt v. Cooper,* 130 Tex.

433, 110 S.W.2d 896, 899 (1937) *and City of Fort Worth v. Gulf Refining Co.,* 125 Tex. 512, 83

S.W.2d 610, 617 (1935). If the primary purpose of the exaction is for regulation, then it is a license

fee; however, if the primary purpose of the exaction is to raise revenue, then it is an occupation tax,

regardless of the name by which it is designated.  *Id*.   Whether an exaction is for regulation or for

raising revenue, involves the question of reasonableness and presents a question of fact.  *Id*.

Where there is no direct relationship between the payment of fees and the receipt of services, and the revenue from the fees exceeds the reasonable costs of regulation, the fees in effect represent a tax rather than a fee. *City of Houston*, 879 S.W.2d at 327. One indication that a fee is in fact a tax is that it subsidizes the provision of fees to the general public rather than directly benefitting the payor of the fee. *Id.* at 330-31. The Texas Supreme Court's recent decision in *Lowenberg v. City of Dallas* is on point. *Lowenberg v. City of Dallas*, 261 S.W.3d 54, 58 (Tex. 2008). In *Lowenberg*, the city charged a "registration fee" to offset the administrative cost of collecting fire safety information on commercial buildings. However, the amount charged was more than the administrative costs; it was intended to cover the costs of fire prevention in commercial buildings, shifting that burden from the taxpayers. Because the revenue generated exceeded the cost of the service for which the fee was imposed, the Supreme Court of Texas had "little trouble concluding that the fee was a tax." *Lowenberg*, 261 S.W.3d at 58.

While Defendants argue that the fees are based on the cost of service, they do not represent the cost of providing the service to the persons paying the fees; instead, the fees are used to generate revenue to provide the service to all persons within the city, including those that pay no fees, and to further Defendants' policy initiatives. Substantial evidence exists which will allow a reasonable trier of fact to find that the fees being imposed on Plaintiffs do not represent the cost of providing them services, but instead, are used to generate revenue and include policy judgments of the sort appropriate to taxation, including:

- As described in detail above, Plaintiffs and other persons who reside in residences of four or more units are charged fees for impervious surface area used as parkways and walkways, while persons classified under Defendants' rate structure as residential are not charged these fees, even though a square foot of impervious surface area imposes the same

cost wherever it is located.  Because of the exclusion of exterior impervious surface area from residential properties, the rate structure does not reflect the actual cost to provide stormwater drainage service to those properties.  (Kistenmacher dep. p. 84-85).  On a per-square-foot basis, a typical apartment complex pays more than twice the amount paid by a typical residential subdivision for the same service.

•       Costs associated with paved surfaces exterior to single-family residences are not charged to those residences, but are spread to all ratepayers, including non-residential class ratepayers.  (Giardina dep. p. 76-77).  In fact, a majority of the cost imposed by impervious surface area in front of residential properties is paid by non-residential customers.  (Giardina dep. p. 78-79).

•       In its ordinance authorizing the stormwater fee, the City made the decision to require ten percent of the revenues collected to be used specifically to provide for acquisition of open-space land and preservation of that land in its natural state.  (Def. m.s.j. Ex. B, p. 3, § III(D)).  This was a policy decision by the City.  (Inj. hrg. p. 34-35, 50).  The decision to include this "cost" in the budget represents a policy decision by the City, not a cost of providing stormwater drainage service to affected properties.

•       According to Ed Archuleta, president and CEO of the Public Service Board, the main reason for charging more to Plaintiffs is his opinion that they are for-profit businesses.[6]  (Inj. hrg. p. 32-33).  This policy decision is one which may be considered in assessing a tax, but whether a ratepayer is for-profit or not-for-profit has no relationship to the costs of providing the stormwater service.  (Kistenmacher dep. p. 71-72).  The decision that ratepayers

---

[6] As discussed above, this justification does not actually support the classification made by Defendants, since they charge single-family rent homes at the residential rate, make no provision for inhabitation of quadruplexes or larger structures by their owners, and do not consider whether a business is actually profitable before imposing the non-residential rates.

perceived as commercial for-profit entities should pay more for the same service indicates that the fee does not actually represent the cost of providing the service.

•       Defendants made the policy decision to reduce the fees payable by school districts. It entered into agreements with school districts to grant them a reduced rate. (Costanzo dep. p. 37-40; Archuleta dep. p. 55). While reducing amounts payable by schools is appropriate as a social policy decision, it is the type of decision made in enacting tax policy. Because of the fee reduction to schools, the costs imposed by their property are allocated to other rate payers. The use of the stormwater fee charged to Plaintiffs and other rate payers to raise the revenue needed to provide the service to school districts establishes that the fee is in reality a tax, not a fee, under Texas law.

•       At the meeting where Defendants voted to reduce the fees payable by school districts, at the mayor's suggestion, they made the further decision to reduce the fees payable by non-profit social agencies and churches. (Giardina dep. p. 50-51; Archuleta dep. p. 49-50, 53-54). The cost to provide the service to these entities was not reduced. (Giardina dep. p. 96). However, Defendants made the policy decision to reduce the rates paid by those entities to 25 percent of the rates they had been paying. (Giardina dep. p. 96). Defendants decided to raise the rates on other categories of payees to make up for that reduction in revenue. (Archuleta dep. p. 50). Thus, fees were adjusted upwards from an initial proposed rate which would have accounted for a fee reduction to schools as well as an overall reduction, in order to recapture revenue associated with granting this reduction. (Giardina dep. p. 60-61; Costanzo dep. p. 45-46). As Defendants' ratemaking consultant testified, in order to account for the reduction in rates charged to nonprofits and churches, they had to increase rates elsewhere. (Giardina dep. p. 61). The decision to shift these fees from non-profit social

agencies and churches to other ratepayers is a policy decision which may be appropriate when a tax is assessed; but again, demonstrates that the fees charged to Plaintiffs and other ratepayers are intended to raise the revenue necessary to provide the stormwater service citywide, rather than to recoup the cost of providing the service to the ratepayer.

- Similarly, although the stormwater service is provided throughout El Paso as a whole, Defendants are barred by law from assessing a fee to certain federal and state-owned properties. (Costanzo dep. p. 67-70; Giardina dep. p. 75-76). These properties impose the same cost on the stormwater system on a per-square-foot basis as any other properties. (Giardina dep. p. 76; Costanzo dep. p. 72). Instead of using general revenue tax funds to pay for these costs, Defendants use the stormwater fee to raise these funds; the costs of providing this service are allocated to the rate payers. (Giardina dep. p. 75-76; Costanzo dep. p. 81-82). This use of the stormwater fee to raise revenue in order to provide the service to these properties, rather than using tax funds to do so, establishes that it is in reality a tax, rather than a fee.

- In determining the initial fee, Defendants included an adjustment of the area measurement in order to account for a realization rate. (Giardina dep. p. 132). The adjustment rate used was 2 percent for residential properties, but was 25 percent for its non-residential category, effectively increasing the rates to so-called non-residential payors on a proportional basis. (Giardina dep. p. 132-33).

- Many properties, including several of Plaintiffs' apartment complexes, are required by the City to construct private drainage ponds on their properties at the time of construction. (Inj. hrg. p. 10-11, 36-37). These ponds are constructed to a standard above the 100-year flood standard; the City begins with that standard and then imposes a 25 percent margin-of-

error or "fudge factor," as well as requiring a foot of freeboard above that level.  (Inj. hrg. p. 11; Kistenmacher dep. p. 89).  In effect, the ponds are designed to a 150-year or 200-year standard.  (Kistenmacher dep. p. 89).  This means that in any given year, there is less than one percent chance that the capacity of the drainage pond will be exceeded by a storm, such that the pond may overflow and the property will impose some drainage cost on the City's storm system.  (Kistenmacher dep. p. 88-90; Archuleta dep. p. 73-74; Inj. hrg. p. 11).  Despite the fact that property containing such a retention pond has no more than a one percent chance of imposing any cost on the city's stormwater drainage system, the credit allowed to the property for the pond was originally only ten percent; it was later raised to 25 percent.  (Giardina dep. p. 116; Archuleta dep. p. 54).  The assessment of seventy-five or ninety percent of the stormwater fee to a property with only a one percent chance of imposing any cost for the service also indicates that the fee is being used to generate revenue for the benefit of all residents, rather than being used to pay the cost of providing the service to the person charged.

•       While this litigation has been pending, the City of El Paso passed an incentive measure allowing qualified new apartment buildings, in certain circumstances, to receive a refund of their stormwater fees.  (Adauto dep. p. 11).  Again, this demonstrates the use of the stormwater fee to accomplish policy initiatives rather than to simply recoup the cost of providing the service to the payor; indicating that the charge is not a fee intended to recoup the cost of providing services, but a tax intended to generate revenue.

Taken as a whole, the evidence demonstrates that in multiple respects, Defendants manipulated the fee structure to accommodate public policy objectives and to raise revenue from rate payers to provide stormwater service to those who do not pay fees.  Even if any of the above facts

was not sufficient  individually to demonstrate that the charge was a tax rather than a fee, taken as whole, this evidence permits a reasonable jury to find that the stormwater fee is in fact intended to raise revenue, rather than merely to recover the costs associated with providing stormwater drainage service to those who receive that service.  Therefore, a reasonable jury may conclude that the charge is a tax rather than a fee under Texas law.  Defendants' motion for summary judgment should be denied.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Court deny Defendants' motion for summary judgment, and for such other relief to which they may be justly entitled.

Respectfully submitted,


/s/ James A. Martinez
**James A. Martinez**
State Bar No. 00791192
James A. Martinez, P.L.L.C.
501 N. Kansas, Suite 201
El Paso, Texas 79901
915/543.9712
915/543.9718 fax

And


/s/ John P. Mobbs
John P. Mobbs
State Bar No. 00784618
4157 Rio Bravo
El Paso, Texas 79902
Tel. (915) 541-8810
Fax (915) 532-8373

ATTORNEYS FOR PLAINTIFFS


## **CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2009, I electronically filed the foregoing with the clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel.


/s/ John P. Mobbs
John P. Mobbs