IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| EL PASO APARTMENT ASSOCIATION, | § | |
| et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | EP-08-CV-145-DB |
| | § | |
| CITY OF EL PASO, et al., | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

On this day, the Court considered Defendants City of El Paso, et al.'s "Motion for Summary Judgment," filed in the above-captioned cause on April 3, 2009. On May 7, 2009, Plaintiffs El Paso Apartment Association, et al. filed a Response, to which Defendants filed a Reply on May 12, 2009. After due consideration, the Court is of the opinion that the instant Motion should be granted for the reasons set forth below.

### BACKGROUND

The instant cause arises from the levying by the El Paso Water Utility - Public Service Board ("PSB") of a storm-water fee upon all water consumers in El Paso, Texas. On June 19, 2007, the City of El Paso ("City") approved and adopted Ordinance 16668, which established a municipal drainage utility system and declared it to be a public utility under the authority and management of the PSB. On March 1, 2008, the PSB began assessing storm-water fees.

The storm-water fee structure divides consumers into residential and non-residential classifications. The Court refers to this division as the rate classifications. Residential consumers are defined as having three or less units, such as single-family, duplex, or

triplex properties. Non-residential consumers are defined as having four or more units. The PSB categorized Plaintiffs—owners of apartment complexes with four or more units—as non-residential consumers.

The PSB uses the square footage of impervious land on a piece of property to calculate storm-water fees for residential consumers and non-residential consumers alike.[1] The PSB selects the measurement practice and then calculates the associated fees, however, differently depending on the consumer's classification as residential or non-residential. Residential consumers are divided into three categories—small, typical, and large—and are placed in one of those categories according to the square footage of their impervious land.[2] The PSB uses the El Paso Central Appraisal District ("CAD") data to assess residential consumers' square footage of impervious land. CAD data includes the square footage of the building and garage. Residential consumers then pay a flat fee based on the category in which they fall.

Non-residential consumers, on the other hand, pay an amount based upon an exact measurement of the square footage of impervious land. The PSB does not use CAD data to assess the impervious land of non-residential consumers. The Court refers to the use of CAD data for residential consumers and of exact measurement for non-residential consumers as the PSB's measurement practices. The PSB assesses a fee on non-residential consumers based upon the number of Equivalent Residential Units ("ERUs") of impervious land on a piece of property.

---

[1] Impervious land contributes to storm-water run-off because it cannot soak up rain.

[2] Small residential consumers have 1200 or less square feet of impervious land. Typical residential consumers have between 1201 and 3000 square feet of impervious land. Large residential consumers have more than 3000 square feet of impervious land. Eighty-one percent of residential consumers fall in the typical category.

An ERU is defined as 2000 square feet of impervious land.  For example, a non-residential

consumer with 6000 square feet of impervious land would pay the monthly ERU fee times three.

On May 7, 2008, the PSB decided to reduce the storm-water fee by 37 percent

effective June 1, 2008.[3]  Small residential consumers are charged $1.49, typical residential

consumers are charged $2.97, and large residential consumers are charged $5.94 under the

reduced, current monthly rates.  Non-residential consumers are charged $3.03 monthly per ERU.

Also on May 7, 2008, the PSB decided to exempt public schools from paying storm-water fees

from March 1, 2008, through August 31, 2008, and to thereafter reduce their fee rate.  The PSB

also decided to charge social services non-profit organizations and churches 25 percent of the

non-residential ERU rate.

On April 28, 2008, Plaintiffs filed the instant Complaint, alleging that Defendants

violated the Equal Protection Clause of the Fourteenth Amendment to the United States

Constitution ("Equal Protection Clause"), the Fair Housing Act ("FHA"), and Article VIII, § 1 of

the Texas Constitution.  Plaintiffs seek injunctive and declaratory relief, restitution, and attorneys

fees.  The instant Motion followed.

## STANDARD

Summary judgment should be granted only where "the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(c).  A material fact is one that "might affect the outcome of the suit under the governing law

---

[3] Under the original monthly rates, small residential consumers were charged $2.38,
typical residential consumers were charged $4.75, and large residential consumers were charged
$9.50.  Non-residential consumers were charged $4.85 monthly per ERU.

. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is inappropriate where a material fact is "genuine" in that a reasonable jury could return a verdict for the nonmoving party.  *Id.*  Thus, the Court considers all the evidence in the record, but makes no determination as to credibility of the evidence.  *See id.*  Further, the Court views factual questions and inferences in a light most favorable to the nonmovant.  *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002).

   The moving party bears the initial burden of identifying those portions of the pleadings, the discovery, and the disclosure materials on file which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "If the moving party fails to meet this burden, the motion must be denied, regardless of the nonmovant's response."  *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).  If the movant meets this burden, however, the nonmovant must designate specific facts showing that a genuine issue for trial exists.  *Celotex*, 477 U.S. at 324.  The nonmovant discharges this burden by alleging more than mere legal conclusions drawn from the pleadings.  *Anderson*, 477 U.S. at 248-49; *Celotex*, 477 U.S. at 324 (stating the nonmovant may not successfully oppose summary judgment by merely citing the pleadings).  Instead, the nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment.  *Anderson*, 477 U.S. at 248-49.  If the nonmovant fails to make a sufficient showing on an essential element of his case, the movant is entitled to summary judgment, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

## DISCUSSION

In the instant Motion, Defendants assert that no genuine issue of material fact exists as to Plaintiffs' three claims. Defendants further argue that they are entitled to summary judgment on all three claims. Specifically, Defendants first aver that the rates do not violate the Equal Protection Clause, as a rational basis exists for the rate classifications and measurement practices. Next, Defendants argue that the rates do not violate the FHA, as the rates do not create a discriminatory impact. Finally, Defendants contend that the rates do not violate the Texas Constitution, as the fees are not an occupation tax and are equal to the cost of providing storm-water drainage services to El Paso. Plaintiffs respond that the rates violate the Equal Protection Clause because Defendants had no rational basis for their rate classifications or their measurement practices. Next, Plaintiffs assert that the rates violate the FHA because, comparing the proportion of minorities residing in non-residential properties to those residing in residential properties, a discriminatory impact exists. Finally, Plaintiffs argue that the rates are an occupation tax and violate the Texas Constitution. The Court agrees with Defendants and will address each of Plaintiffs' claims in turn.

## A. Equal Protection Clause

First, the Court considers Defendants' argument that a rational basis exists for the PSB's rate classifications and measurement practices and that, therefore, the rates do not violate the Equal Protection Clause. Defendants argue that it was rational to create the rate classifications and use different measurement practices because of the discrepancies and inaccuracies in CAD data pertaining to non-residential consumers and because of the feasibility

of individually measuring non-residential consumers' impervious land.[4] Further, Defendants

assert that it was rational to use CAD data to measure residential consumers' impervious land

because of the cost and time that would be required to individually measure this land. Plaintiffs

counter that the difficulty in measuring actual total impervious land for residential consumers is

not a rational basis for the rate classifications and measurement practices. Instead, Plaintiffs

argue that it would have been more efficient for Defendants to have used CAD data for all

consumers. Alternatively, Plaintiffs assert that a fee on residential consumers could have been

assessed based on a survey of representative residential consumers, thereby accounting for the

impervious land of driveways excluded from CAD data. The Court is unconvinced by Plaintiffs'

arguments.

Pursuant to the Equal Protection Clause, a state cannot "deny to any person within

its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. This safeguard

applies to both administrative and legislative acts. *Engquist v. Or. Dept. of Agr.*, __ U.S. __, 128

S. Ct. 2146, 2150 (June 9, 2008). If the state creates a classification that does not involve a

suspect or quasi-suspect classification such as race, religion, or gender, then rational basis review

---

[4] Additionally, Defendants present the following bases for the rate classifications and measurement assessments: (1) following the class designations of customer meters in the water and wastewater billing system, in which apartments are not classified as residential meters, thereby facilitating the use of the existing water and wastewater billing system, expedited billing, and allowed customers to receive a single utility bill; (2) distinguishing apartment complexes from residential consumers because individual apartment units do not typically have separate meters but residential consumers do; (3) distinguishing apartment complexes from residential consumers because apartments are commercial, for-profit businesses; and (4) distinguishing apartment complexes from residential consumers because apartment complexes can have such large proportions of impervious land. As the Court finds that the difference in the quality of CAD data for residential and non-residential consumers is a rational basis for the rate classifications and measurement practices, the Court does not consider whether Defendants' other bases are also rational.

applies. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). "Under

rational-basis review, where a group possesses 'distinguishing characteristics relevant to interests

the State has the authority to implement,' a State's decision to act on the basis of those

differences does not give rise to a constitutional violation." *Bd. of Trustees of Univ. of Ala. v.

Garrett*, 531 U.S. 356, 366-67 (2001) (quoting *Cleburne*, 473 U.S. at 441). Accordingly, a

classification does not violate the Equal Protection Clause "if there is a rational relationship

between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*,

509 U.S. 312, 320 (1993). Whether this requisite rational relationship exists is a question of law.

*Mikeska v. City of Galveston*, 451 F.3d 376, 379 (5th Cir. 2006). The state need not articulate its

reasoning at the time it makes a particular decision. *Garrett*, 531 U.S. at 367. Rather, the party

challenging the governmental action has the burden to negate "'any reasonably conceivable state

of facts that could provide a rational basis for the classification.'" *Id.* (quoting *Heller*, 509 U.S.

at 320).

      In the instant case, the Court first notes that the Parties do not dispute the fee

structure or the facts underlying Defendants' asserted rational bases. As such, no material fact is

at issue. Whether any of these asserted bases are, in fact, rational is a question of law. *See

Mikeska*, 451 F.3d at 379. The Court further notes that Defendants need not have chosen the

most efficient or rational fee structure. *See Garrett*, 531 U.S. at 367. Rather, Plaintiffs must

show that no rational relationship possibly exists between the rate classifications and

measurement practices and a legitimate governmental purpose. *See Heller*, 509 U.S. at 320.

      First, Plaintiffs do not dispute that assessing fees to provide storm-water services

is a legitimate governmental purpose. Indeed, municipalities can establish a municipal drainage

utility system and prescribe how fees are to be levied to support the system.  TEX. LOC. GOV'T

CODE ANN. § 552.042(a)(1), (5) (Vernon 2005 & Supp. 2008).[5]  Therefore, the PSB has a

legitimate governmental purpose in providing storm-water services and levying fees to support

the cost of those services.  Plaintiffs question, however, the rationality of the PSB's rate

classifications, which distinguish between consumers with three or less units (residential) and

consumers with four or more units (non-residential), and the rationality of the PSB's

measurement practices, which calculate impervious land differently for these two classes.[6]

Defendants explain that the distinction drawn in the rate system between

residential and non-residential consumers is due to the suspect CAD data for non-residential

consumers.  While CAD data for properties in the residential class was reasonably accurate, CAD

data for properties in the non-residential class had discrepancies and inaccuracies.  For example,

_____

[5]  As of April 1, 2009, the Municipal Drainage Utility Systems Act ("Drainage Act") is codified at Texas Local Government Code §§ 552.001 *et seq.*  Previously, the Drainage Act was codified at Texas Local Government Code §§ 402.001 *et seq.*

[6]  Plaintiffs claim that the existing fee structure results in Plaintiffs paying substantially more than residential consumers and thereby subsidizing the cost of storm-water services imposed on the City by residential consumers.  Plaintiffs, however, have not supported this claim with any data.  Plaintiffs offer the comparison computed by Robert L. Bowling IV ("Bowling") at the Preliminary Injunction Hearing held in the instant case on May 12, 2008.  This comparison, however, is riddled with errors.  First, Bowling did not explain whether the properties he chose to compare represented an apartment complex and a residential subdivision with a typical proportion of impervious land.  Second, Bowling included public streets in his calculation of impervious land for the residential subdivision, even though the storm-water fee is not assessed on public streets.  Third, once the public streets are subtracted from the comparison, the two properties are no longer of comparable size.  Despite being aware of these problems with the comparison as of May 12, 2008, Plaintiffs rely solely on Bowling's comparison to support their argument that a typical apartment complex only has approximately 1.14 times as much impervious land as an equivalently-sized subdivision yet the apartment complex pays 3.83 times as much in storm-water fees.  Even construing this comparison in the light most favorable to Plaintiffs, it does not support Plaintiffs' argument.

Defendants found inconsistencies between CAD data and the utility billing system regarding property classifications for non-residential consumers and between CAD data and the geographic information system data regarding non-residential consumers' property boundaries. Plaintiffs do not negate this reasonably conceivable state of facts. Defendants further explain that it was feasible to measure each non-residential consumer's impervious land, as non-residential consumers are less than 10 percent of the total number of consumers. The cost and time of doing so for residential properties, however, rendered the task impractical.[7] Thus, non-residential consumers share the distinguishing characteristics of having unreliable CAD data. Given the number of these consumers and the interest in having reliable, accurate data upon which to base the fees, it was rational for Defendants to rely on CAD data for residential consumers and to individually measure non-residential consumers' impervious land.

While both measurement practices assess the square feet of impervious land, there are some differences. CAD data includes the square footage for the structure and garage, but it does not systematically include driveways, patios, and walkways.[8] The individual assessments of

---

[7] The PSB measured the impervious land of the approximately 11,400 non-residential consumers over the course of six months for a total cost of $447,169.45. To perform a similar task for the approximately 144,000 residential consumers would cost an estimated $5.634 million and take the PSB six years to complete.

[8] In their Response, Plaintiffs state without any evidence that CAD data only includes the square footage for the structure and not any other impervious land. Plaintiffs' expert witness Glen Kistenmacher ("Kistenmacher"), however, stated in his deposition that CAD data includes garages and that he would not be surprised if CAD data includes the square footage of a patio or internal walkway if the owner received a permit to build that structure. Kistenmacher had not analyzed CAD data to determine whether, as a systematic matter, CAD lacks data regarding the square footage of patios and walkways. Construing the evidence in the light most favorable to Plaintiffs, CAD data includes the square footage for the structure of the building and any garage. *See Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002).

non-residential consumers' impervious land include the square footage for the structure, internal

drives, parking lots, and walkways. Thus, the entirety of residential consumers' impervious land

may not be captured by CAD data whereas all of non-residential consumers' impervious land is

captured. Nevertheless, it was rational for Defendants to consider all known impervious land

when assessing storm-water fees.[9] Indeed, such inclusion furthers the legitimate governmental

interest of generating fees to pay for storm-water services in a manner "directly related to

drainage."[10] TEX. LOC. GOV'T CODE ANN. § 552.047(a) (Vernon 2005 & Supp. 2008).

Thus, Defendants have shown that a rational basis—suspect CAD data for

consumers with four or more units and the feasibility of obtaining individual assessments of

those consumers' impervious land—exists for the PSB's storm-water rate classifications and

measurement practices. Therefore, the Court is of the opinion that the fee structure does not

violate the Equal Protection Clause and that Defendant's Motion should be granted as to this

claim.

## B. Fair Housing Act

Second, Defendants argue that no genuine issue of material fact exists as to

Plaintiffs' FHA claim. Further, Defendants assert that this claim necessarily fails because the

storm-water fee has no disparate impact on a protected group. Even if Plaintiffs could show a

---

[9] Further, the Court notes that residential consumers do not have the benefit of paying a rate based on the exact measurement of their impervious land. Instead, residential consumers are divided into three rate categories which pay a flat fee for storm-water services based on the category in which CAD data places them.

[10] Storm-water fees are also levied on residential consumers in a manner directly related to drainage. Due to limitations of available data and the extreme cost of obtaining more accurate data, the PSB, however, relies on CAD data to place each residential property in the appropriate rate category.

disparate impact, Defendants contend that the storm-water fee serves a legitimate governmental purpose and no less drastic or discriminatory means are available to attain this purpose. Plaintiffs respond that Plaintiffs' residents are disproportionately racial and ethnic minorities as compared to the residents of residential properties. Therefore, Plaintiffs claim that Defendants' fee structure, which assesses storm-water fees on apartments differently than on single-family residences, results in apartments paying higher fees and has a disparate impact on racial minorities.[11] Plaintiffs further contend that Defendants have no legitimate governmental interest in charging apartments a higher storm-water fee than single-family homes and that a feasible meaningful alternative would be to use CAD data for all properties. Defendants reply that a statistically meaningful difference does not exist in the racial makeup of residents of residential and non-residential properties and that Plaintiffs have failed to offer alternative data showing a disparate impact. The Court agrees with Defendants that Plaintiffs have not shown a disparate impact.

The FHA prohibits discrimination against any person in the provision of services in connection with the sale or rental of a dwelling. 42 U.S.C.A. § 3604(b) (West 2003). "[A] claim brought under the Act 'may be established not only by proof of discriminatory intent, but also by proof of a significant discriminatory effect.'" *Artisan/American Corp. v. City of Alvin, Tex.*, __ F.3d __, 2009 WL 3789902, at *2 (5th Cir. Nov. 13, 2009) (quoting *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996)). Discriminatory effect or disparate impact claims do not require proof of intent to discriminate. *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir.

---

[11] Plaintiffs do not clarify whether the non-residential storm-water fee is borne by apartment owners or by tenants. While apartment owners receive the storm-water bill, they may pass this cost on to their tenants.

2000).  Rather, a plaintiff proceeding under a disparate impact theory must identify (1) a facially

neutral policy, procedure, or practice and (2) "a significantly greater discriminatory impact on

members of a protected class." *Simms*, 83 F.3d at 1555; *see Tsombanidis v. W. Haven Fire*

*Dept.*, 352 F.3d 565, 574 (2d Cir. 2003).  Such a discriminatory impact can be evidenced by

"statistical disparities disadvantaging members of a protected group." *Munoz*, 200 F.3d at 299.

Accordingly, a court must consider whether the "policy in question [has] a disproportionate

impact on the minorities in the total group to which the policy was applied." *Betsey v. Turtle*

*Creek Assocs.*, 736 F.2d 983, 987 (4th Cir. 1984).

      A plaintiff bears the burden of proving a violation of the Act by a preponderance

of the evidence. *Elderhaven, Inc. v. City of Lubbock, Tex.*, 98 F.3d 175, 178 (5th Cir. 1996).  If

the plaintiff sustains this burden, the burden shifts to the defendant to show that the policy or

practice serves "a legitimate, bona fide governmental interest and that no alternative would serve

that interest with less discriminatory effect." *Huntington Branch, N.A.A.C.P. v. Town of*

*Huntington*, 844 F.2d 926, 936 (2d Cir. 1988), *aff'd in part* 488 U.S. 15 (1998) (citing *Resident*

*Advisory Bd. v. Rizzo*, 564 F.2d 126, 148-49 (3d Cir.1977), *cert. denied* 435 U.S. 908 (1978)).

      Here, Plaintiffs identify the facially neutral policy as the PSB's storm-water fee

structure, which classifies apartments of four or more units as non-residential consumers and

charges them a storm-water fee based on an individual assessment of impervious land instead of

CAD data.  Plaintiffs claim that the storm-water fee structure has a disparate impact on a

protected class—racial and ethnic minorities—because a disproportionate number of residents of

non-residential properties are minorities.[12]  The Parties do not dispute the fee structure or the

statistics provided by the United States Census Bureau's 2007 American Community Survey

("ACS").  As such, no material fact is in question.  The Parties disagree, however, on how those

statistics should be compared, the import of confidence intervals, and whether the policy

disproportionately affects minorities.

   The Court first determines which comparisons are appropriate in the instant case.

The challenged storm-water fee structure applies to all eligible properties in El Paso, yet

Plaintiffs allege that apartments are adversely affected because of how those fees are assessed.

Thus, it is proper to compare the residents of non-residential properties and to all El Paso

residents.[13]  *See Graoch Assocs. #33, L.P. v. Louisville/Jefferson County Metro Human Relations*

*Comm'n*, 508 F.3d 366, 378 (6th Cir. 2007) (comparing the population of those adversely

affected by landlord's policy to the population of all tenants).  Seventy-nine percent of all El Paso

---

   [12]  A facially neutral housing decision can have two types of disparate impact: (1) "a greater adverse impact on one racial group than on another," or (2) a perpetuation of segregation by preventing interracial association.  *Graoch Assocs. #33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n*, 508 F.3d 366, 378 (6th Cir. 2007) (internal quotation omitted); *see Artisan/American Corp. v. City of Alvin, Tex.*, ___ F.3d ___, 2009 WL 3789902, at *5 n.20 (5th Cir. Nov. 13, 2009).  Plaintiffs never alleged the second type of disparate impact specifically or any facts from which the Court could infer a segregative effect.  *See Graoch Assocs. #33, L.P.*, 508 F.3d at 379.  Accordingly, the Court only addresses the first type of disparate impact.

   [13]  Neither Party submitted evidence of the demographics of apartment residents specifically.  Rather, both Parties rely on the ACS data, which is grouped by one unit, two units, *three or four* units, five-to-nine units, etc.  Unfortunately, the ACS data for the three-or-four units group spans the division between the PSB's categories of residential and non-residential properties.  As such, Defendants' expert, Dr. John R. Alford, analyzed the data in two ways: (1) using statistics of one and two units to represent residential properties and statistics of three or more units to represent non-residential properties ("Case 1"), and (2) using statistics of one-to-four units to represent residential properties and statistics of five or more units to represent non-residential properties ("Case 2").  Since Case 1 presents statistics most favorable to Plaintiffs, the Court considers these statistics unless otherwise noted.  *See Calbillo*, 288 F.3d at 725.

residents are minorities.  In non-residential properties, 84.2 percent of the population is minority.

This difference of 5.2 percent is not significant.[14]  *See Simms*, 83 F.3d at 1555 (requiring the

impact on the protected class to be significantly greater); *Graoch Assocs. #33, L.P.*, 508 F.3d at

378-79 (stating in dicta that a difference of 4 percent was not significant).  It is also proper to

compare the residents of residential properties to the residents of non-residential properties.  *See*

*Tsombanidis*, 352 F.3d at 577 (comparing the group affected by the policy and the group not

affected).  While 77.4 percent of the residents of residential properties are minorities, 84.2

percent of the residents of non-residential properties are minorities.  This difference of 6.8

percent is also insignificant.

      Next, the Court considers the import of confidence intervals.  When comparing

and analyzing statistics, courts commonly consider confidence intervals to understand the

significance of these statistics, particularly if the statistics are drawn from a sample.  *See Brock v.*

*Merrell Dow Pharms., Inc.*, 874 F.2d 307, 312 (5th Cir. 1989); *Magistrini v. One Hour*

*Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 605 & n.27 (D.N.J. 2002).  In simple terms, a

confidence interval is a margin of error.  *Brock*, 874 F.2d at 312.  As the United States Court of

Appeals for the Fifth Circuit explained,

> 'the confidence interval tells one that if repeated samples were drawn from [a
> population] in the same way as the instant sample was drawn, the means of the
> samples drawn would fall within the confidence interval a certain percentage, say 95
> percent, of the time.  On the basis of this information, researchers customarily
> conclude that the true mean of the [population] falls within the confidence limits.'

*Univ. Computing Co. v. Mgmt. Sci. Am., Inc.*, 810 F.2d 1395, 1399 n.4 (5th Cir. 1987) (quoting

---

[14]  Under Case 2, 83 percent of the residents of non-residential properties are minorities.
When compared to the percentage of minority residents of all properties, a mere 4 percent
difference exists.

14

DAVID C. BALDUS & JAMES W. L. COLE, STATISTICAL PROOF OF DISCRIMINATION 310 n.39

(1980)).  Accordingly, if the confidence intervals of two statistics overlap, then a court cannot be

statistically certain that the statistics are different.  *See Brock*, 874 F.2d at 312.

   Here, the ACS data—upon which the Parties rely—is not drawn from a complete

count of all households, but rather from estimates compiled from a sample of households.

Consequently, other household samples would result in similar, but not identical, estimates.

Accordingly, Defendants' expert, Dr. John R. Alford ("Dr. Alford"), computed confidence

intervals of 90 and 95 percent for the ACS data.  Plaintiffs do not dispute that ACS data reflects

estimates or that Dr. Alford properly calculated the confidence intervals.  Applying Dr. Alford's

computations to the statistical comparisons identified above, the Court can be 90 percent certain

that minorities comprise 77.2 to 80.7 percent of the population of El Paso and that the percentage

of minorities in non-residential properties falls between 79.4 to 89 percent.  These confidence

intervals overlap.[15]  Similarly, the Court can be 90 percent certain that the percentage of

minorities residing in residential properties is 74.6 to 80.2 percent, which also overlaps with the

90 percent confidence interval for minorities residing in non-residential properties.  The Court

cannot—particularly in a case such as this where the statistical differences are so small—ignore

the statistical uncertainty of said data.  Given the overlapping confidence intervals, the Court

cannot find to a statistical certainty that a greater proportion of minorities live in non-residential

properties as opposed to residential properties or all El Paso properties subject to storm-water

---

  [15]  Of course, the 95 percent confidence intervals overlap to an even greater degree: 77.2
to 80.7 percent of El Paso residents are minorities, 78.5 to 89.9 percent of the residents of non-
residential properties are minorities, and 74.1 to 80.7 of the residents of residential properties are
minorities.

fees. Thus, no disparate impact on the identified protected class exists.

Even if a racial disparity existed between the residents of residential properties and non-residential properties, Plaintiffs have not shown that residents of non-residential properties are adversely affected by the storm-water fees. Plaintiffs claim that the storm-water fees impose a significantly greater fee on non-residential relative to residential consumers, but they offer no sound analysis to support this assertion.[16] Indeed, apartments are charged $3.03 per ERU (2000 square feet), and a residential home of 2000 square feet pays a flat fee of $2.97. A monthly difference of 6 cents is *de minimus*. Nor have Plaintiffs shown how the fee structure affects apartment residents—of whom racial and ethnic minorities are the purported protected class—as opposed to apartment owners. Thus, Plaintiffs have failed to show that the storm-water fee structure has a significant disparate impact on minorities. As such, the Court need not consider whether the instant policy serves a legitimate governmental interest nor whether any alternative means with a less disparate impact exist. *See Huntington Branch, N.A.A.C.P.*, 844 F.2d at 936.

Since the Court finds that no genuine issue of material fact exists as to Plaintiffs' FHA claim and that Plaintiffs have not demonstrated that the storm-water fee has a significant disparate impact on minorities, the Court is of the opinion that the fee structure does not violate the FHA. Therefore, Defendant's Motion should be granted as to this claim.

---

[16] While Plaintiffs claim that non-residential consumers are charged over three times the fee that residential consumers are charged, this claim has already been discredited. *See supra* 8 n.6. Further, Plaintiffs do not provide any other analysis as to how storm-water fees disproportionately impact apartments. As such, Plaintiffs have not provided any evidence that apartments are being charged a disproportionate amount in storm-water fees.

## C. Unconstitutionally Excessive Tax

Finally, Defendants argue that Plaintiffs' claim based on the Texas Constitution must fail. First, Defendants contend that the fee is not an occupation tax given that a particular profession or business is not the sole object of the fee. Next, Defendants assert that the fee does not generate revenue that exceeds the cost of regulation. Defendants explain that the fee was lawfully enacted, is imposed on the entire population of El Paso, is based on the cost of service, and can only be used to provide drainage services to El Paso. Plaintiffs respond that whether a fee is for regulation or for raising revenue presents a question of fact and of reasonableness. Further, Plaintiffs contend that the primary purpose of the storm-water fee is to raise revenue because the fee charged to a particular property does not represent the cost of providing drainage services to that property. Finally, Plaintiffs argue that the fee is a tax on non-residential consumers because it generates revenue to provide drainage services to all of El Paso and to further Defendants' policy initiatives, such as reducing the fees paid by school districts, social service non-profit agencies, and churches. Defendants reply that the storm-water fee bears a reasonable relationship to the PSB's legitimate object of providing storm-water drainage services and that the PSB exercised an appropriate amount of discretion in designing the fee structure and drainage service program. The Court agrees with Defendants.

Before addressing the constitutional question raised by Plaintiffs, the Court first sets out the statutory authority for instituting a storm-water fee. The Municipal Drainage Utility Systems Act ("Drainage Act") provides that the governing body of a municipality may declare the drainage of the municipality to be a public utility. TEX. LOC. GOV'T CODE ANN. § 552.045(a) (Vernon 2005 & Supp. 2008). Doing so requires the municipality to establish a schedule of

drainage charges and to "offer drainage service on nondiscriminatory, reasonable, and equitable terms." § 552.045(b)(1), (3).  The fee assessment on a property that benefits from drainage service "must be directly related to drainage and the terms of the levy . . . ." TEX. LOC. GOV'T CODE ANN. § 552.047(a).  Further, any classification of these properties "must be nondiscriminatory, equitable, and reasonable." § 552.047(a).  In setting the schedule of charges, "the governing body must base its calculations on an inventory of the lots and tracts within the service area." § 552.047(b).  The Drainage Act also requires that the income from a drainage utility system "be segregated and completely identifiable in municipal accounts." TEX. LOC. GOV'T CODE § 552.049 (Vernon 2005 & Supp. 2008).  Drainage charges can only be transferred to the municipal general fund if they are solely for the cost of service.  § 552.049.  If the municipality collects drainage charges in order to fund future drainage system improvements, that amount is not transferable to the general fund.  § 552.049.  Pursuant to the Drainage Act, the City declared drainage service to be a public utility, allocated the drainage service management to the PSB, and established a fee structure.  City of El Paso, Ordinance 16668 (June 19, 2007).

Plaintiffs do not attack whether the classifications are nondiscriminatory, equitable, and reasonable, nor whether the fee was calculated based upon a proper inventory of the lots and tracts within the service area.[17]  *See* § 552.047(a)-(b).  Rather, Plaintiffs assert that

---

[17]  Indeed, Plaintiffs recognized their failure to make this claim when they filed a Motion for Leave to File Second Amended Complaint on January 16, 2009.  Therein, Plaintiffs prayed the Court allow them to include a fourth cause of action—that Defendants violated the Drainage Act by imposing a charge that is not nondiscriminatory, equitable, and reasonable.  *See* TEX. LOC. GOV'T CODE ANN. §§ 552.045, 552.047(a) (Vernon 2005 & Supp. 2008).  On April 15, 2009, the Court denied the requested leave, refusing to exercise its supplemental jurisdiction over the additional claim.

the storm-water fee is constitutionally excessive.[18]  Specifically, Plaintiffs allege that the storm-water fee is an occupation tax and, therefore, violates Article VIII, § 1.

"An occupation tax is a form of excise tax imposed upon a person for the privilege of carrying on a business, trade or occupation."[19]  *Conlen Grain & Mercantile, Inc. v. Tex. Grain Sorghum Producers Bd.*, 519 S.W.2d 620, 624 (Tex. 1975).  Unlike a legitimate fee assessed on a profession or business, the primary purpose of an occupation tax is to raise revenue.  *Hurt v. Cooper*, 110 S.W.2d 896, 899 (Tex. 1937).  Courts recognize that "almost all fees or assessments are intended to raise revenue.  The critical issue is whether the assessment is intended to raise revenue in excess of that reasonably needed for regulation."  *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 461 (Tex. 1997).  Accordingly, courts customarily look to the relationship between the revenue generated by a fee and the regulatory

---

[18]  The Complaint states that the Texas Constitution places "limits on the amount of a fee a municipality can impose on its citizens" and that "[t]he amount of a fee must reflect the actual cost a municipality incurs to provide the service for which the fee is charged."  Plaintiffs allege that otherwise the fee is "an impermissible tax."  The only provision of the Texas Constitution that Plaintiffs cite in the Complaint is Article VIII, § 1, explaining that this section prohibits a city from imposing a tax "on a person or corporation pursuing a profession or business in an amount greater than one-half of the occupation tax levied by the State on that profession or business."  The Court quotes the Complaint at length in order to present Plaintiffs' claim, which the Court interprets as alleging that the storm-water fee violates Article VIII, § 1 as it is an occupation tax because the amount of the fee exceeds the PSB's costs of providing drainage services.

[19]  For example, the Texas Supreme Court found that an assessment on sorghum producers was an occupation tax as only persons or businesses producing sorghum grain for commercial purposes—and all such persons or businesses—were charged the assessment.  *Conlen Grain & Mercantile, Inc. v. Tex. Grain Sorghum Producers Bd.*, 519 S.W.2d 620, 624 (Tex. 1975) ("The subject of taxation is the thing or business done; the occupation followed for and on account of which the tax is imposed on persons and corporations that pursue it.").  Similarly, the Texas Supreme Court found that an ordinance which imposed a fire registration fee only on commercial buildings was an occupation tax.  *Lowenberg v. City of Dallas*, 261 S.W.3d 54, 59 (Tex. 2008).

costs to determine whether the fee is a tax. *See Lowenberg v. City of Dallas*, 261 S.W.3d 54, 58

(Tex. 2008); *City of Houston v. Harris County Outdoor Adver. Ass'n*, 879 S.W.2d 322, 326 (Tex.

App.–Hous. [14th Dist.] 1994, writ den'd). If the revenue generated by a fee is greater than the

regulatory cost, then the fee is a tax. *Tex. Boll Weevil Eradication Found., Inc.*, 952 S.W.2d at

461. Accordingly, in order to be an occupation tax, a fee must be (1) imposed on a particular

profession or business and (2) generate revenues greater than the regulatory cost. *See id.*; *Conlen*

*Grain & Mercantile, Inc.*, 519 S.W.2d at 624.

Article VIII, § 1 of the Texas Constitution provides that a city may levy an

occupation tax "on persons or corporations pursuing any profession or business," but that such a

tax "shall not exceed one half of the tax levied by the State . . . on such profession or business."

TEX. CONST. art VIII, § 1(f). Thus, if the State does not tax a profession or business at all,

neither can a city. *Harris County Outdoor Adver. Ass'n*, 879 S.W.2d at 326. Furthermore, the

Texas Constitution requires that an occupation tax, like all other taxes, "be equal and uniform."

TEX. CONST. art VIII, §§ 1(a), 2(a).

Here, all eligible water consumers are assessed a storm-water fee.[20] Apartment

owners or their tenants are charged the storm-water fee as are other commercial property owners

and residential consumers.[21] Therefore, the Court is of the opinion that the storm-water fee is not

---

[20] Certain consumers are exempt from paying storm-water fees by federal or state law, such as the University of Texas at El Paso and the federal courthouse. *See* TEX. LOC. GOV'T CODE ANN. § 580.003(a) (Vernon 2005 & Supp. 2009).

[21] The Court recognizes that Plaintiffs may be attacking as the occupation tax only the manner in which the storm-water fee is assessed for apartments in contrast to residential consumers. Even so, the methodology used for apartments is the same as that used for all properties of four or more units, some of which are not in the business of renting apartments. Furthermore, Plaintiffs have not produced any evidence detailing the disproportionate fees

an occupation tax as it is not assessed on a profession or business.  Accordingly, the fee is not

subject to Article VIII, §§ 1(f) or 2(a).[22]

      Assuming *arguendo* that the storm-water fee is assessed on a profession or

business, the Court examines the relationship between the revenue generated by the fee and the

cost of drainage services.  Plaintiffs do not dispute Defendants' calculations of its overall costs

and projections of its revenue.[23]  The PSB calculated and adjusted the storm-water fee based on

---

apartments incur because of the fee structure.

[22] Furthermore, a reasonable charge for a utility service is not a tax.  *See Bexar County v. City of San Antonio*, 352 S.W.2d 905, 907 (Tex. Civ. App. 1962).  Texas courts have held that a sewer charge is not a tax because "a city may make a reasonable charge for the benefits received by those who use its sewers, sufficient to operate and maintain such sewer system and to provide for replacements and future extensions thereof."  *Id.*; *see City of Wichita Falls v. Landers*, 291 S.W. 696, 701 (Tex. Civ. App. 1927, writ ref'd); *Mulkey v. City of Kaufman*, 286 S.W. 620, 623 (Tex. Civ. App. 1926, writ ref'd).  The Drainage Act specifically allows a city to declare the drainage of the municipality to be a public utility and to assess charges that are directly related to drainage and are nondiscriminatory, equitable, and reasonable.  TEX. LOC. GOV'T CODE ANN. §§ 552.045(a), 552.047(a).  Accordingly, the Drainage Act grants municipalities some discretion in setting a reasonable charge for the benefits received by those who cause storm-water runoff thereby requiring municipal drainage services.  *See Bexar County*, 352 S.W.2d at 907.  The Drainage Act also contemplates a fee which would support maintenance and future development of storm-water services.  § 552.049; *see Bexar County*, 352 S.W.2d at 907 (noting that utility fees to support future extensions and maintenance is not a tax).  Thus, the Court is of the opinion that the storm-water fee is not a tax so long as it is reasonable and does not generate more revenue than it costs to provide drainage services.

[23] Plaintiffs complain that an individual property pays more than its share of the drainage services because certain properties are exempt or have a reduced fee.  Plaintiffs further argue that apartments pay for part of the services residential consumers receive because residential consumers' driveways are not included in their impervious land calculations whereas all of the non-residential consumers' impervious land is included.  The Drainage Act, however, only requires that the fee be "directly related" to drainage, "nondiscriminatory, equitable, and reasonable," and based "on an inventory of the lots and tracts within the service area."  TEX. LOC. GOV'T CODE ANN. § 552.047(a)-(b).  Thus, Plaintiffs seek more precision in the relationship between a consumer's fee and the cost of services than the statute requires.  Thereby, Plaintiffs challenge the constitutionality of the Drainage Act.  Plaintiffs, however, have failed to give the Texas Attorney General notice of this challenge.  *See* TEX. CIV. PRAC. & REM. CODE ANN.

the estimated cost of drainage services and projections for future drainage projects. When the

PSB reduced rates in May 2008, the PSB also adjusted its costs so as to not exceed the fee

revenue. As such, the PSB complied with the Drainage Act and ratemaking principles.[24]

Further, pursuant to the Drainage Act and Ordinance 16668, the City cannot use collected storm-

water fees for any purpose other than to provide drainage services. TEX. LOC. GOV'T CODE ANN.

§§ 552.047, 552.049; City of El Paso, Ordinance 16668, at Section V.A. Therefore, the Court

---

§ 37.006(b) (Vernon 2008). As such, the Court will not question the constitutionality of the
Drainage Act.

      Plaintiffs challenge the decision to reduce the fees payable by school districts,
social service non-profit agencies, and churches. Since these entities' impervious land
contributes the same amount of runoff regardless whether they pay the full or partial fee,
Plaintiffs argue that apartments are subsidizing others' drainage services. Nevertheless, the total
revenue from the fees still does not exceed the cost of drainage services. *See Tex. Boll Weevil
Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 461 (Tex. 1997). Furthermore,
residential consumers are also "subsidizing" the drainage services for exempt or discounted
properties. As such, the fees are not an *occupation* tax, as they are not assessed on a profession
or business. Whether the fees are equitable and reasonable as required by § 552.047(a) is not a
question before the Court.

      Next, Plaintiffs challenge the PSB's decision to require 10 percent of the revenues
collected to be used for the acquisition of open-space land and preservation of that land in its
natural state. Such acquisition and preservation undoubtedly reduces storm-water runoff and is a
reasonable allocation of revenue for the provision of drainage services.

      Finally, Plaintiffs assert that the fees are unconstitutional because the City requires
several of Plaintiffs' apartment complexes to construct private drainage ponds to a 150-year or
200-year standard yet only offers a 25 percent credit for having such a pond. This complaint
does not change the cost versus fees comparison discussed above, and as previously explained,
the question of whether the fee structure is equitable and reasonable is not before the Court. *See*
§ 552.047(a).

[24] Determining a just and reasonable utility rate "is far from a precise process." *Pub.
Utility Comm'n of Tex. v. GTE-Sw., Inc.*, 901 S.W.2d 401, 411 (Tex. 1995). Indeed, "ratemaking
relies substantially upon informed judgment and expertise and utilizes projections and estimates
in virtually all areas." *Id.*

finds that the City had the authority to levy a storm-water fee and that, as the fee is levied in an amount needed to provide storm-water drainage services, it is not an occupation tax. *See Tex. Boll Weevil Eradication Found., Inc.*, 952 S.W.2d at 462. Thus, even if the storm-water fee is considered an exaction on a profession or business, it is a legitimate fee and not an occupation tax. As such, the storm-water fee does not violate Article VIII, § 1. Accordingly, the Court is of the opinion that the instant claim should be dismissed.

## CONCLUSION

For the reasons stated above, the Court is of the opinion that the instant Motion should be granted in full. Defendants have identified the lack of a genuine issue of material fact as to all three claims, and Plaintiffs have failed to demonstrate that any material fact is indeed at issue. As to Plaintiffs' Equal Protection Clause claim, the Court finds that Defendants have demonstrated a rational basis for the fee structure, namely the poor quality of CAD data for non-residential consumers. Plaintiffs' FHA claim also fails because Plaintiffs cannot show that the fee structure has any discriminatory impact as no statistically significant difference exists in the proportion of minorities residing in non-residential properties, residential properties, or El Paso as a whole. Finally, Plaintiffs' claim based on the Texas Constitution fails because the fee cannot be characterized as an occupation tax. The fee is not exacted solely on a profession or business, and the revenue generated by the fee does not exceed the cost of providing drainage services. Accordingly, the Court finds that the following order should enter:

**IT IS HEREBY ORDERED** that Defendant City of El Paso, et al.'s "Motion for Summary Judgment" is **GRANTED**.

**SIGNED** this **18th** day of **December, 2009**.

THE HONORABLE DAVID BRIONES
SENIOR UNITED STATES DISTRICT JUDGE