# United States Court of Appeals
### FIFTH CIRCUIT
### OFFICE OF THE CLERK



LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE
NEW ORLEANS, LA 70130

March 31, 2011

Mr. William Putnicki
Western District of Texas, El Paso
United States District Court
525 Magoffin Avenue
Room 108
El Paso, TX 79901-0000

> No. 10-50069,   El Paso Apartment Association, et al v.
> City of El Paso, et al
> USDC No. 3:08-CV-145

Enclosed, for the Western District of Texas, El Paso only, is a copy of the judgment issued as the mandate and a copy of the court's opinion.

The electronic copy of the record has been recycled.

Sincerely,

LYLE W. CAYCE, Clerk

By: Christina Gardner

Christina A. Gardner, Deputy Clerk
504-310-7684

cc: (letter only)
    Mr. Alejandro Acosta Jr.
    Mr. Howard Michael Bookstaff
    Honorable David Briones
    Mr. Douglas G. Caroom
    Mr. Sydney W. Falk Jr.
    Mr. James Allen Martinez
    Mr. John Patrick Mobbs II

P.S. to Judge Briones:  A copy of the opinion was sent to your office via email the day it was filed.

MDT-1

United States Court of Appeals
Fifth Circuit

# UNITED STATES COURT OF APPEALS

**F I L E D**

March 9, 2011

Lyle W. Cayce
Clerk

# FOR THE FIFTH CIRCUIT

---

No. 10-50069

---

D.C. Docket No. 3:08-CV-145

EL PASO APARTMENT ASSOCIATION; EPT APACHE ARMS LIMITED
PARTNERSHIP; EPT CORTESIA DEL REY APARTMENTS LIMITED
PARTNERSHIP; EPT SANTA FE VILLAGE APARTMENTS LIMITED
PARTNERSHIP; EPT DESERT TREE APARTMENTS LIMITED
PARTNERSHIP; ET AL,

      Plaintiffs - Appellants

v.

CITY OF EL PASO; EDMUND G. ARCHULETA, In His Official Capacity as
President and Chief Executive Officer of the El Paso Water Utilities Public
Service Board,

      Defendants - Appellees

Appeal from the United States District Court for the
Western District of Texas, El Paso

Before KING, DeMOSS, and PRADO, Circuit Judges.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by
counsel.

It is ordered and adjudged that the judgment of the District Court is
affirmed.

IT IS FURTHER ORDERED that plaintiffs-appellants pay to
defendants-appellees the costs on appeal to be taxed by the Clerk of this
Court.

ISSUED AS MANDATE: MAR 3 1 2011

A True Copy
Attest

Clerk, U.S. Court of Appeals, Fifth Circuit

By: _Christen ... Gardner_
      Deputy

MAR 3 1 2011

New Orleans, Louisiana

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit
**F I L E D**
March 9, 2011

Lyle W. Cayce
Clerk

No. 10-50069

EL PASO APARTMENT ASSOCIATION; EPT APACHE ARMS LIMITED
PARTNERSHIP; EPT CORTESIA DEL REY APARTMENTS LIMITED
PARTNERSHIP; EPT SANTA FE VILLAGE APARTMENTS LIMITED
PARTNERSHIP; EPT DESERT TREE APARTMENTS LIMITED
PARTNERSHIP; ET AL,

Plaintiffs – Appellants

v.

CITY OF EL PASO; EDMUND G. ARCHULETA, In His Official Capacity as
President and Chief Executive Officer of the El Paso Water Utilities Public
Service Board,

Defendants – Appellees

Appeal from the United States District Court
for the Western District of Texas
No. 3:08-CV-145

Before KING, DeMOSS, and PRADO, Circuit Judges.

PER CURIAM:*

Plaintiffs–Appellants, owners and managers of apartment complexes in
El Paso, Texas, challenged the stormwater drainage fee assessed on their
properties, arguing that the fee violates the Equal Protection Clause of the

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 10-50069

Fourteenth Amendment and that it is an unconstitutional occupation tax under Texas law. The district court granted summary judgment to Defendants–Appellees, the City of El Paso and Edmund Archuleta, the CEO of the El Paso Water Utility Public Service Board. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are largely undisputed. The Municipal Drainage Utility Systems Act (the "Drainage Act"), Tex. Local Gov't Code Ann. §§ 552.041–552.054, permits a municipality in Texas to establish a public utility for the provision of stormwater drainage services. The Drainage Act permits a municipality to assess a drainage fee to each piece of improved property served by the drainage utility "on any basis other than the value of the property, but the basis must be directly related to drainage." § 552.047(a).

Severe storms in August 2006 caused substantial flooding in El Paso, Texas (the "City"). In response, the City enacted Ordinance 16668 in June 2007, creating a stormwater drainage utility under the Drainage Act. The City delegated the management and operation of the utility to the El Paso Water Utilities Public Service Board (the "Board"). Prior to the ordinance, the City's streets department provided limited storm water drainage services that were financed by the City's general tax fund.

In December 2007, the Board adopted an order implementing the drainage utility and assessing a drainage fee on each piece of improved real property in the City, with the exception of certain exempt properties, based on the amount of impervious cover on the property. The order defines "impervious cover" as "any area that has been disturbed from its natural condition in such a way as to reduce the ability of the surface to absorb and infiltrate water into the soil." Impervious cover includes "buildings, pavement, parking lots, driveways, sidewalks, and any other man-made structure or surface."

2

No. 10-50069

The Board classified the properties in the City into two primary rate classes: residential and non-residential. The residential property class includes all single family, duplex, and triplex properties. The residential class is divided into three subclasses: (1) "small" properties with 1,200 square feet or less of impervious cover; (2) "typical" properties with between 1,201 and 3,000 square feet of impervious cover; and (3) "large" properties with more than 3,000 square feet of impervious cover. The non-residential property class is not subdivided and includes apartment buildings with four or more units, commercial and industrial properties, and all other properties not classified as residential.

The Board used different methods to determine the amount of impervious cover on residential and non-residential properties. For the approximately 140,000[1] residential properties in the City, the Board determined that it would be cost- and time-prohibitive to measure the actual impervious cover on each property. Instead, the Board estimated the amount of impervious cover on residential properties using data from the El Paso Central Appraisal District ("CAD"), which is used primarily for property tax purposes. The data includes a measurement of the surface area of the main building and the area of any structural additions such as garages and tennis courts, but the data often does not include the area of paved driveways, sidewalks, or patios, though it is possible that the CAD data may capture some of these areas. For the approximately 11,400 non-residential properties, the Board measured the actual square footage of impervious cover using a combination of the CAD data, GIS and aerial photography, and site visits. Unlike the CAD estimate used for residential properties, the actual measurement of impervious cover on non-residential properties includes private driveways, sidewalks, and parking lots.

---

[1] The record suggests that the City now contains over 160,000 residential properties and over 13,000 non-residential properties. We use the statistics the parties supplied in their briefs.

3

No. 10-50069

After calculating the total amount of impervious cover in the City, the Board apportioned its estimated annual revenue requirement of $17 million between the residential and non-residential classes, assigning each class its proportionate share of the revenue requirement.    Following some other adjustments for collection rates and billing costs, the Board arrived at the following current rates: "small" residential properties are assessed a flat rate of $1.49 per month; "typical" residential properties are assessed a flat rate of $2.97 per month; and "large" residential properties are assessed a flat rate of $5.94 per month. Charges for non-residential properties are assessed based on Equivalent Residential Units ("ERU"), which are equal to 2,000 square feet of impervious cover. The monthly charge per ERU is $3.03, and the total fee is calculated by dividing the property's impervious square footage by 2,000 and multiplying that number by $3.03.    Certain kinds of property, such as those owned by state agencies and publicly or privately owned institutions of higher education, are statutorily exempt from paying drainage charges. Tex. Local Gov't Code Ann. § 580.003(a). The Board also decided to exempt federally-owned properties and provide a lower rate to school districts, churches, and social-service agencies.

After the new stormwater drainage fees went into effect, several apartment complex owners and managers challenged the classification of their properties as non-residential and the fees assessed on their properties. Represented by their trade association, the El Paso Apartment Association (referred to collectively with the apartment complex owners and managers as the "Apartments"), they filed suit in the United States District Court for the Western District of Texas against the City and Edward Archuleta, the President and CEO of the Board. The Apartments alleged in their complaint that the Board's rate structure violates their right to equal protection of the laws, that it violates the Fair Housing Act of 1968, and that the drainage fee is an illegal "occupation tax" under Texas law.

4

No. 10-50069

At the close of discovery, the defendants moved for summary judgment, arguing that there were no material facts in dispute and that the Apartments' claims failed as a matter of law. The district court granted the motion for summary judgment, and the Apartments filed the instant appeal, contending that the district court erred in granting summary judgment with respect to their Equal Protection and Texas state law claims. The Apartments do not challenge the district court's ruling on their Fair Housing Act claim.

## II.  STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, applying the same standard as the district court and viewing the evidence in the light most favorable to the non-movant. *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.  EQUAL PROTECTION CLAIM

The Apartments' first claim is that the Board's use of different methods to measure the impervious cover of residential and non-residential properties violates the Equal Protection Clause. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting U.S. CONST. amend. XIV, § 1). These protections extend to administrative as well as legislative acts. *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 597 (2008).

"[U]nless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an

5

inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). "[A] classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," and the burden is on the challenger to "negative every conceivable basis which might support [the classification]." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (citations and internal quotation marks omitted).

At the outset, the Apartments do not dispute that the provision of stormwater drainage services is a legitimate governmental purpose. They also agree that the Board may charge properties in the City for those services based on each property's square footage of impervious cover. Impervious surfaces, such as buildings, driveways, and sidewalks, prevent stormwater from being absorbed into the ground. The resulting runoff burdens the stormwater drainage system. Therefore, the amount of impervious cover on a particular piece of property is directly related to that property's use of the stormwater drainage system. Given the legitimacy of the Board's objective, we conclude that the Board's use of two different methods to measure the impervious cover on the properties in the City is rationally related to its decision to charge each property for stormwater drainage services.

Faced with the task of measuring the square footage of impervious cover on over 150,000 properties in the City, the Board determined that the most efficient way to go about this task was to use the existing CAD data, which provided a rough estimate of each property's impervious cover. However, according to the Board, the CAD data was flawed in several respects for many of the properties classified as non-residential so the data could not be used to estimate the impervious cover for those properties. Furthermore, the CAD data did not include a large amount of impervious cover usually found on non-

No. 10-50069

residential properties, such as private driveways, sidewalks, and parking lots. The Board therefore decided to actually measure the impervious cover of each non-residential property, spending six months and over $400,000 measuring the impervious cover on approximately 11,400 non-residential properties in the City.

Although the CAD data for the residential properties was also missing the square footage of private driveways and sidewalks, the Board did not individually measure the impervious cover for each residential property because it was not feasible to do so. The Board estimates that measuring the actual impervious cover of all residential properties may cost over $5.6 million and take more than six years. The cost and delay of measuring the actual square footage of impervious cover for residential properties provide a rational basis for treating the residential and non-residential classes differently.

The Apartments argue that the Board's decision to measure the actual square footage for some properties, including driveways, sidewalks, and parking lots, but use an estimate, which does not include driveways, sidewalks, and parking lots, for other properties was arbitrary and irrational. The Apartments suggest that the Board should have measured for non-residential properties only those types of impervious surfaces that are captured by the CAD data for residential properties, *i.e.*, the Board should not have included private driveways, sidewalks, and parking lots in the impervious cover measurement for the Apartments' properties because those areas are not included in the CAD estimate for residential properties. That argument misapprehends both the purpose and effect of using different methods to measure the impervious cover. The Board has not granted an exemption or given a discount to residential properties for the driveways and walkways that may not be captured by the estimate of impervious cover derived from the CAD data; the Board simply has no effective way to measure the actual area of impervious cover and include it

7

No. 10-50069

on the drainage bill for residential properties, so the Board instead used an estimate of the impervious cover on residential properties.

Moreover, the Equal Protection Clause does not require the level of mathematical exactitude that the Apartments seek. *See Heller*, 509 U.S. at 321 ("A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." (citation and internal quotation marks omitted)). The Apartments have not demonstrated that the Board's use of an estimate for residential properties resulted in excluding so much impervious cover in the City that the method is wholly unrelated to the Board's objective of charging for stormwater drainage services based on impervious cover. *Cf. Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 315–16 (1976) (holding that a mandatory retirement statute did not violate the Equal Protection Clause even though it had the effect of excluding from service some qualified officers). The Board avers, and the Apartments do not dispute, that only four percent of the impervious cover in the City is excluded from measurement because the Board uses the CAD estimate, rather than actual measurements, for residential properties.

The Apartments also suggest that the Board could have remedied the perceived inequality by adding the size of an "average" or "typical" driveway to the impervious cover estimate for each residential property. The Board considered and rejected such an approach because there is no such thing as a "typical" driveway in the City: some residential properties have no driveway at all, some have very small driveways, and some have very large driveways. Adding the size of an "average" driveway to the impervious cover for each residential property would not increase the level of precision in measuring the impervious cover on residential properties and could result in charging some residential properties for impervious cover they do not have.

8

No. 10-50069

Finally, the Apartments contend that the Board's decision to place apartment buildings with four or more units in the non-residential class and apartment buildings with three or fewer units in the residential class was arbitrary and irrational. The Board asserts that it classified the Apartments' properties as non-residential in part because the Board used its existing billing system, in which the Apartments' properties are not classified as residential, to bill for stormwater drainage services. The Apartments provided no evidence or argument why this was not a rational choice. Therefore, the Apartments have not met their burden to prove that the Board's classification and rate structure has no rational basis.

## IV.   OCCUPATION TAX CLAIM

The Apartments next allege that the stormwater drainage fee is an unlawful occupation tax under the Texas state constitution. Under Texas law, an occupation tax is "a form of excise tax imposed upon a person for the privilege of carrying on a business, trade or occupation."[2] *Conlen Grain & Mercantile, Inc. v. Texas Grain Sorghum Producers Bd.*, 519 S.W.2d 620, 624 (Tex. 1975). The Texas state constitution provides that an occupation tax imposed by a city cannot "exceed one half of the tax levied by the State for the same period on such profession or business." TEX. CONST. art. VIII, § 1(f). If the state has no tax for a particular occupation, or if the tax imposed by the city exceeds one half of the

---

[2] The district court held that the stormwater drainage fee is not an occupation tax because the fee is not assessed on any particular profession or business, such as the business of owning or operating a multi-family apartment building. Rather, it is assessed on every property in the City, except those that are exempt. The district court further questioned whether a utility fee such as the stormwater drainage fee can ever be an occupation tax. *See Bexar Cnty. v. City of San Antonio*, 352 S.W.2d 905, 907 (Tex. Civ. App.—San Antonio 1962, writ dism'd) (holding that a charge for sewer services was a utility fee and not a tax because "a city may make a reasonable charge for the benefits received by those who use its sewers"). The Board urges us to affirm the district court on these bases. Because we conclude that the stormwater drainage fee does not meet the standard for an occupation tax under Texas law, we do not address the argument that a fee such as the one at issue here could never be an occupation tax.

state's tax, the city's tax is unconstitutional. *Id.*; *City of Houston v. Harris Cnty. Outdoor Adver. Ass'n*, 879 S.W.2d 322, 326 (Tex. Civ. App.—Houston 1994, writ denied). It is undisputed that the state does not assess a stormwater drainage fee to property owners. Therefore, if the stormwater drainage charge is a tax, rather than a fee, it is unconstitutional.

We start with the presumption that the stormwater drainage fee assessed by the Board is valid, and the burden is on the Apartments, as the parties attacking the fee, to demonstrate that it is invalid.[3] *Bexar Cnty. v. City of San Antonio*, 352 S.W.2d 905, 907 (Tex. Civ. App.—San Antonio 1962, writ dism'd); *see also City of Fort Worth v. Gulf Refining Co.*, 83 S.W.2d 610, 618 (Tex. 1935) (holding that an annual fee for filling stations "is under the law prima facie valid, and unless its unreasonableness has been made to appear it must be sustained"). To determine whether a fee is in reality an occupation tax, Texas courts consider "whether the primary purpose of the exaction, when the statute or ordinance is considered as a whole, is for regulation or for raising revenue." *City of Houston*, 879 S.W.2d at 326. "Revenue," as used by Texas courts, "means the amount of money which is excessive and more than reasonably necessary to cover the cost of regulation." *Producers Ass'n of San Antonio v. City of San Antonio*, 326 S.W.2d 222, 224 (Tex. Civ. App.—San Antonio 1959, writ ref'd n.r.e.); *see also Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 461 (Tex. 1997) ("The critical issue is whether the assessment is intended to raise revenue *in excess* of that reasonably needed for regulation."). Whether

---

[3] We note that the Apartments do not attack the validity of the Drainage Act or the validity of the City's ordinance creating the stormwater drainage utility and delegating its operation to the Board. Furthermore, the Apartments do not contend that the schedule of drainage fees established by the Board does not comply with Drainage Act's requirements that drainage fees be "nondiscriminatory, equitable, and reasonable." Tex. Local Gov't Code Ann. § 552.047(a). We therefore express no opinion on these subjects, and we address only the question whether the drainage fees at issue are unlawful occupation taxes.

a fee is reasonably necessary to cover the cost of regulation is a question of fact. *City of Houston*, 879 S.W.2d at 326.

The Texas cases addressing this issue have generally distinguished between license or regulatory fees and occupation taxes. The stormwater drainage fees at issue in this case do not fit neatly into the category of a license or regulatory fee, but the cases involving challenges to these sorts of fees are instructive and neither party has suggested that the provision of stormwater drainage services is not within the police or regulatory power of the City. *See Lewellen*, 952 S.W.2d at 462. ("The abatement of nuisances is within the regulatory power of the State."). In *Lowenberg v. City of Dallas*, 261 S.W.3d 54 (Tex. 2008) (per curiam), the court held that the fee charged annually to commercial buildings was an occupation tax because "the revenue generated greatly exceeded any regulatory cost" to collect fire prevention information on the buildings and incorporate the information into a database. *Id.* at 58. Similarly, in *City of Houston*, the court held that a permit fee charged to billboard operators was an unconstitutional occupation tax because a detailed accounting study confirmed that the fee generated revenue that exceeded the cost to regulate the billboard operators. 879 S.W.2d at 329–30. On the other hand, in *Producers Association*, the court upheld a dairy inspection fee because the fee generated only approximately $30,000 in revenue when the annual inspection costs were over $38,000. 326 S.W.2d at 224.

Here, the Board submitted evidence that the reasonable cost to provide stormwater drainage services to the City is approximately $17 million per year. The Apartments have provided no evidence to suggest that this amount is unreasonable or that it does not represent the Board's actual cost to provide the City with stormwater drainage services. On the contrary, the Apartments appear to agree that the annual cost to provide stormwater drainage services to the City as a whole is approximately $17 million. Because the Apartments

11

provided no evidence that the Board collects more than $17 million per year from the stormwater drainage fee, we conclude that the fee is not an unlawful occupation tax.

Nonetheless, the Apartments argue that the drainage charge is not reasonably related to the provision of stormwater drainage services to their properties. *See City of Houston*, 879 S.W.2d at 326–27 (noting that a license or regulatory fee "must bear some reasonable relationship to the legitimate object of the licensing ordinance" (emphasis omitted)). The Apartments suggest that we ought to examine their fees on an individual basis to determine whether the amount paid directly benefits each individual payor. While Texas courts do require that the amount of the fee be related to the level of regulatory or licensing services received by the payors, they do not require *perfect* correspondence between the fee charged and the service received. *See id.* at 329–32; *see also Producers Ass'n*, 326 S.W.2d at 224 (examining the total revenue generated by the inspection fee, rather than each producer's individual fee, to determine whether the fee was an unlawful occupation tax).

Even were we to examine the drainage fee with such precision, the Apartments have not provided any facts from which a fact-finder could conclude that the amount they are charged exceeds the Board's cost to provide stormwater drainage service to their properties. *See City of Houston*, 879 S.W.2d at 326 ("Before such legislation will be declared void, the unreasonable and oppressive nature of the exaction must be clearly apparent from the record."). The Apartments simply assert that the actual cost to provide stormwater drainage services to their properties *must* be lower than what they are being charged because certain properties in the City, including those owned by school districts, religious organizations, social-service agencies, and state and federal agencies, pay a reduced fee or no fee at all. The Apartments argue that the fees they pay are thus being used to subsidize the provision of services to these so-called

"socially-favored properties." However, the fact that the Board has classified properties and charged different rates to the properties in the City does not, by itself, automatically lead to the conclusion that the fees charged to the Apartments' properties are unrelated to the services they receive. The Apartments provided no evidence regarding the amount they allege is used to subsidize the provision of services to other properties; nor have they provided any evidence regarding the amount that they allege they may have overpaid.

The Apartments' remaining theories that the drainage fees are unrelated to the provision of stormwater drainage services are afflicted with the same lack of evidence necessary to create a genuine factual issue. *See Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[T]he nonmoving party must come forward with specific facts showing there is a genuine issue for trial." (emphasis and internal quotation marks omitted)). First, the Apartments claim that the drainage fee is unrelated to stormwater drainage services because ten percent of the fees collected are allocated to various "Green Projects," including the acquisition of "open spaces, greenways, arroyo and wilderness areas in their natural state," but the Apartments have provided no evidence that the acquisition of open space is unrelated to stormwater management. Second, the Apartments claim that certain of their properties are assessed a drainage fee even though the properties present little risk of creating stormwater runoff that would burden the drainage system because the properties have their own drainage ponds. The Board provides a twenty-five percent credit to certain properties with drainage ponds, and it has set up a system whereby property owners can apply for complete exemption. However, the Apartments do not contend that any of their properties place *no* burden on the drainage system, or that they applied for and were denied an exemption for any of their properties. Finally, the Apartments take issue with the Board's adjustment to the drainage fee for its expected revenue realization rate (the amount billed to all properties

No. 10-50069

vis-à-vis the expected collection amount). The Board used a seventy-five percent revenue realization rate for non-residential properties and a ninety-eight percent revenue realization rate for residential properties. The Apartments do not contest the factual basis for the adjustment—*i.e.*, that the Board will not collect every dollar billed—they simply claim that this adjustment for non-residential properties was unreasonable without providing any evidence that the Board should have used a different realization rate or none at all.

The stormwater drainage fee charged by the Board does not produce revenue in excess of the cost necessary to provide stormwater drainage services to the City. In addition, the Apartments have provided no evidence from which we, or a reasonable jury, could conclude that the drainage fees charged to the Apartments are not reasonably related to the stormwater drainage services provided. Therefore, we hold that the drainage fees are not unconstitutional occupation taxes under Texas law.

## V.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.